585 S.E.2d 602

**In re W. Bernard SMITH.**

No. 13493.

Supreme Court of Appeals of
West Virginia.

Nov. 25, 1980.

Concurring Opinion of Harshbarger,
J. Dec. 1, 1980.

Dissenting Opinion of Miller,
J. Dec. 4, 1980.

Harshbarger, J., concurred and filed opinion.

Miller, J., dissented and filed opinion, in which McGraw, J., joined.

John O. Kizer, Robert H. Davis, Jr., Charleston, for Legal Ethics committee.

Beckett, Burford & James and R.H. Burford, Huntington, for Smith.

NEELY, Chief Justice.

This is a petition by a disbarred attorney for reinstatement of his license to practice law, pursuant to Art. VI, § 35 of the *By-Laws, West Virginia State Bar*.[1] The license of the petitioner, W. Bernard Smith, was annulled by this Court on 30 July 1974, *In Re Smith*, 158 W.Va. 13, 206 S.E.2d 920 (1974), after his conviction on 13 December 1971 in the United States District Court for the Southern District of West Virginia for conspiring to cause fraudulent and illegal votes to be cast in a primary election in Logan County contrary to the provisions of Title 18 U.S.C. § 241. This conviction was appealed to the United States Court of Appeals for the Fourth Circuit where it was affirmed and to the United States Supreme Court where it was also affirmed, *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20, (1974) with Justices Douglas and Brennan dissenting.

On 15 July 1974 the petitioner was incarcerated in the Federal Penitentiary at Lewisburg, Pennsylvania, to be returned to the Court after a 90 day period of study with a report and recommendation under the provisions of Title 18, U.S.C. 4208(b). When he was returned to the Court the original maximum sentence was set aside and he was fined $5,000 and sentenced to 179 days of incarcer-

---

1. The applicable part of the *By-Laws*, § 35, reads as follows:

    The annulment of a license to practice law by any court of competent jurisdiction shall revoke and terminate such license, and shall constitute a disbarment; provided, however, after the expiration of five (5) years from the date of such disbarment, a person, whose license to practice law has been or shall be annulled in this State and who shall desire reinstatement of such license, may file a veri-

    fied petition in the supreme court of appeals of West Virginia reciting the court which annulled such license, the cause of such annulment and what he shall have done in satisfaction of requirements as to rehabilitation, restitution, conditions or other acts incident thereto, by reason of which he believes he should be reinstated as a member of the state bar and his license to practice law be restored to him.

ation with credit for time previously served, and five years probation. One condition of his probation was public service without compensation, and in fulfillment of that requirement, the petitioner . moved to Fairmont, West Virginia where he participated in the Senior Aides program for a year.

On 14 September 1979, more than five years after the annulment of petitioner's license, his petition for reinstatement was filed and on 22 April 1980, a three-man subcommittee of the Committee on Legal Ethics of the West Virginia State Bar held an evidentiary hearing on the petition and on 1 July 1980 recommended that the petition for reinstatement be denied. Petitioner then filed his request for our review and reinstatement. The original opinion in this case reinstating petitioner was filed by this Court on 7 October 1980 and on 5 November 1980 the Ethics Committee filed a petition for rehearing, pointing out to the Court that it had incorrectly stated certain principles of law. Upon consideration of the Committee's petition for rehearing the Court concluded that parts of the majority opinion misstated the law, whereupon on the Court's own motion the original opinion was withdrawn and this opinion is substituted in its place. Since the relief for which petitioner prayed is granted, thus causing no prejudice to the petitioner, and since the Committee showed no grounds in its petition which would change the final result in this case, the Court denied the rehearing.

I

Recently this Court spoke to the entire issue of reinstatement in the case of *In re Bonn Brown*, 164 W.Va. 234, 262 S.E.2d 444 (1980) in which we cited with approval *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975) where the Massachusetts Court set forth the broad categories of considerations to which a court should look before reinstating an attorney. We quoted the Massachusetts Court as follows:

In judging whether a petitioner satisfies these standards and has demonstrated the requisite rehabilitation since disbarment, it is necessary to look to (1) the nature of the original offense for which the petitioner

was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills. (Citations omitted.) 164 W.Va. 234, 262 S.E.2d 444 at 446 (1980).

The Committee on Legal Ethics takes the position that the petitioner was convicted of a crime which in and of itself justifies denial of reinstatement to practice law. While the Committee does not argue that the petitioner's license should never be reinstated, they object to reinstatement at this time because of lack of affirmative evidence of rehabilitation. The Committee argues that the petitioner's offense was reprehensible and that the petitioner has not engaged in any affirmative acts which could be called rehabilitation since his disbarment, although the Committee points to no blemishes upon the petitioner's record since his conviction in 1971.

The Committee notes that since his release from confinement and required public service work in the Senior Aides Program in Fairmont, the petitioner has not participated in any civic, community, or religious undertakings which, according to the Committee's argument, would demonstrate rehabilitation. Furthermore, the Committee points to the fact that the petitioner, while earning occasional consulting fees, has primarily relied for his living upon his private resources. The Committee implies that failure to have steady employment at a regular salary in some way casts aspersions upon the character of the petitioner, although they readily admit that the petitioner's private resources were sufficient to sustain him without reliance upon anyone else.

The Committee has long been in favor of permanent disbarment of attorneys. However, this Court has rejected the concept of permanent disbarment at least since the case of *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970) where it was decided before the adoption of the present rule, Art. VI, § 35, that annulment of a license to practice law does not prohibit an application by a dis-

86

barred attorney for a new license as if the former license had never been issued.

In 1971, after our decision in *Daniel, supra,* the State Bar proposed amendments to its *By–Laws* including a provision for permanent annulment of the license of an attorney upon disbarment. *See West Virginia State Bar News.* Dec. 1971, at 5. By order entered in the *Sup.Ct. Order Book No. 71,* at 500, on 7 December 1971 this Court approved all of the suggested amendments except the one providing for permanent annulment of a license to practice. A year later, on 12 December 1972, acting on a petition by the State Bar which resulted from action taken by the Bar at its regular annual meeting held 12 October 1972, this Court entered an order approving an amendment to the *By–Laws* adopting the present rule providing for petitions for reinstatement after the expiration of five years from the date of disbarment.

It should be obvious from a history of Art. VI, § 35 that the Court in recent years has considered it disproportionate punishment to deny an attorney the right to practice law indefinitely. As this Court said in the case of *State ex rel. Harris v. Calendine,* 160 W.Va. 172, 233 S.E.2d 318, at 329–30 (1977) in a different but related context:

At the outset this Court acknowledges that the cruel and unusual punishment standard cannot easily be defined and certainly is not fixed; consequently, we feel the standard tends to broaden as society becomes more enlightened and humane. . . .

A good starting point for applying the cruel and unusual punishment standard . . . is the concept of disproportionality. This concept is explicitly recognized in *W. Va. Const.,* art. III. § 5, "Penalties shall be proportioned to the character and degree of the offence" and is implicit in the Eighth Amendment to the *United States Constitution,* which originates in the same tradition as our own constitutional provision.

■ While the Bar maintains that the permanent annulment of the license of an attorney who is guilty of a crime of moral turpitude is primarily for the purpose of protecting society from unscrupulous lawyers, nonetheless, in cases such as the one

before us there is little justification for denying reinstatement other than to heap additional punishment upon the offending attorney. In the case before us the offense was not related to the practice of law so that the offense itself, while serious, does not raise the specter of future injury to the public through reinstatement of petitioner's license. In general this Court has rejected vengence as a civilized instinct. *See State ex rel. D.D.H. v. Dostert,* 165 W.Va. 448, 269 S.E.2d 401 (1980).

The five year rule is consistent with other decisions of this Court regarding restoration of rights after an individual has been convicted of a crime and served his sentence. The petitioner for example is not disqualified as a voter, *Osborne v. Kanawha County Court,* 68 W.Va. 189, 69 S.E. 470 (1910); he is not disqualified from holding public office, *Webb v. County Court,* 113 W.Va. 474, 168 S.E. 760 (1933); nor is he prohibited from seeking and holding a seat in the West Virginia Legislature, *Isaacs v. Ballot Comrs.,* 122 W.Va. 703, 12 S.E.2d 510 (1940).

II

The petitioner was born in Logan, West Virginia in 1930. He graduated from Marshall University in 1952 and the Washington and Lee School of Law in 1956 where he was a member of the Law Review. He was admitted to practice in 1956 and immediately went to work for the State Tax Department where he served for six months and then became an Assistant Attorney General for the State of West Virginia until 1961. At that time he was appointed State Director of the Department of Public Assistance, commonly called the Department of Welfare. He served as Commissioner of Welfare from 1961 to 1965 and from that time until his disbarment he practiced law in Logan County, West Virginia, during which time he served as Assistant Prosecuting Attorney for approximately one year. Petitioner was elected to the West Virginia State Senate in 1968 and served in that capacity until 1972 when he was removed as the result of the conviction in Federal Court.

While petitioner's case was on appeal to the United States Court of Appeals for the Fourth Circuit and then to the United States Supreme Court he continued to practice law in Logan County. Although his conviction was widely publicized and generally known, he had a substantial practice at the time of his disbarment. When his disbarment became imminent he met with the Judge of the Circuit Court of Logan County and went over a list of all the cases which he had pending and made arrangements with all of his clients for substitute counsel in all cases in which he was involved and arranged to pay his secretary in his law office to keep his office open for thirty days after his incarceration to assist his clients and substitute counsel in making an orderly transition.

The Honorable Naaman J. Aldredge, Chief Judge of the Seventh Judicial Circuit, testified that petitioner was "well recognized in the local community as being a tough, aggressive, competent lawyer, especially in the criminal field." When asked whether he felt the administration of justice in Logan County would suffer if petitioner's request for readmission were granted, he stated: "It's my opinion that Bernard would be a useful member of the legal community in Logan County." Robert M. Harvey, former law clerk for State Supreme Court Justices Frank Haymond and Charles Haden, currently practicing law in Dunbar, West Virginia, testified that although he was not a friend of petitioner, he had observed his appearances, briefs and arguments before this Court and had discussed matters of legal theory with him on occasion. When asked to describe his ability as an attorney before the Supreme Court of Appeals, Mr. Harvey stated: "I would say—on a scale of 1 through 10, I would say he would be a 10 class lawyer. I'd say he was in the top practitioners before the Court as far as his preparation of his pleadings and his research and I think his presentation."

■ While there is testimony in the record that the petitioner is generally of low moral character by virtue of his previous political activities, the record is absolutely devoid of any testimony whatsoever that petitioner ever inadequately represented a client or failed to perform not only as a competent lawyer, but indeed as one of the superior lawyers in West Virginia. To the extent that there is testimony in the record that the petitioner is in general a bad human being, there is equally persuasive testimony that the petitioner's moral character is quite acceptable. This Court has recognized in *Committee on Legal Ethics v. Pence*, 216 S.E.2d 236 (W.Va.1975) that little weight can be attributed to affidavits attesting to good moral character and integrity; alternatively, very little weight can be attributed to general assertions of bad moral character.

The record before us presents no specific facts which would lead a reasonable person to conclude that the petitioner is of bad character. While a number of witnesses testified that they would not trust the petitioner, they alluded to no underlying circumstances which prompted their conclusions. Certainly the general assertions of bad character were more than off-set by general assertions of good character from practicing lawyers and judges. The Court recognizes the inherently obvious, namely that any successful professional person will have both friends and enemies no matter how heinous his crime, nor exemplary his life; accordingly, in order for allegations of bad character to have any weight they must be tied to specific instances of reprehensible conduct which would lead an impartial observer to conclude that a petitioner is of bad character.

■ Where, as in the case before us, the petitioner shows a record of honorable behavior since disbarment the petitioner's burden has been met with regard to those factors which are within his immediate control and the burden is then upon the Committee on Legal Ethics, if they wish to contest reinstatement, to present concrete facts and circumstances which would lead to an inference of bad character or lack of fitness to practice law. There are obviously occasions where the underlying offense which caused the loss of a license is so serious that the Court cannot be confident that the petitioner is sufficiently rehabilitated that the public will be adequately protected. This is particularly the case where the underlying offense was directly related to the practice of law.

The Ethics Committee argues in essence that in order for the petitioner to meet the burden of rehabilitation he must, for all intents and purposes, "live at the foot of the cross" and do constant acts of penance. If the affirmative burden of proof regarding rehabilitation were as heavy as the Committee urges, their proposed rule of evidence would accomplish indirectly what this Court has declined to do directly, namely make reinstatement impossible. Nonetheless, it is unavoidable that there will be cases where the original transgression is so threatening to the integrity of the entire legal system that no brief period of even the most exemplary conduct can provide satisfactory assurance to the Court that the public will be adequately protected. That, however, is not the situation in the case before us.

### III

■ If we now look to the five objective criteria set forth in *Hiss* and *Brown, supra* for determining whether a disbarred attorney should be reinstated, we find that the petitioner is entitled to reinstatement. The nature of the original offense for which the petitioner was disbarred was reprehensible, but it was completely unrelated to the petitioner's law practice or activities as an officer of the Court. The petitioner's character, maturity, and experience at the time of his disbarment certainly do not militate in favor of petitioner's reinstatement, but at the same time, they do not militate against reinstatement. The criteria of character, maturity, and experience are basically designed to permit forgiveness of a young man who has been stupid in his youth and can demonstrate that over the course of years he has become wiser and stronger. That may very well have been the case in *In re Hiss, supra*. These criteria then can only be interpreted positively in those cases where they are applicable and should be ignored in a case like this where there has been no significant change in maturity and experience since the time of disbarment.

The petitioner's occupations and conduct in the time since his disbarment have been entirely honorable. While the Ethics Committee point to the petitioner's lack of regular salaried employment since his disbarment, we find his occupation since disbarment acceptable in light of his participation in his own business, his regular consulting services, and the fact that his private assets were sufficient to provide for his family. The time elapsed since disbarment is over one year longer than that required by our Rules. Finally, there is absolutely no evidence in the record to indicate that petitioner's present competence in legal skills is anything less than superior. The record demonstrates conclusively that during the petitioner's period of disbarment he has actively read in the law and kept himself abreast of all current developments, and that he maintains a keen interest in developing case law and the legal literature in general.

### IV

■ The rule permitting reinstatement after five years is a rule of compassion. As this Court said in *Webb v. County Court*, 113 W.Va. 474, 168 S.E. 760, 761 (1933):

It is the anxious desire of the state that those of her citizens who have transgressed her laws, suffered convictions, and paid the penalty of the law, shall profit from their unfortunate experience and thereafter make of themselves good citizens by leading lives of uprightness and usefulness. (Cited with approval *Isaacs v. Ballot Comrs., supra*).

Except in those cases where the Court must conclude that the petitioner's original transgression alone was so serious that even exemplary subsequent conduct cannot provide adequate assurance that the public's interest will be protected or a factual showing by the Committee on Legal Ethics that petitioner's current conduct or character is unacceptable to the extent that it will endanger the public, an attorney's license to practice will be reinstated after five years of good behavior after disbarment.

Accordingly, for the reasons assigned above the petitioner's application for reinstatement to the West Virginia State Bar as a licensed, practicing attorney is granted.

Application for reinstatement granted.

HARSHBARGER, Justice, concurring.

I perceive the most important function of this Court to be the imposition of the rule of law between authority and those upon whom authority is impressed, to remove every aspect of ad hominem application of constraints upon freedom or use of property, to eliminate subjective judgments promoted by prejudice.*

And the sense of our original majority opinion that has been withdrawn was to set a clear guide for readmission to practice law, by a rule that readmitted persons disbarred who had continued their lives for five years without further default, after paying all penalties for any crime they had committed that resulted in disbarment; or after remedying whatever personal deficiency caused behavior for which they were disbarred.

It was a sensible rule—as sensible as any that I have seen laid down by any other court—in an area wherein every court has had great difficulty finding its way.

Now, with this opinion, readmission to practice is tuned to rehabilitation—an element in Rule 31 but not in Rule 28 which was the original, long-standing guide. The process is opened to prejudiced judgments of a most subjective nature because no one knows what rehabilitation is, in this context; and therefore its existence is nearly impossible of any kind of proof. One judge may believe that hours of work in good causes prove rehabilitation. Another may believe that helping in the soup line in a mission, for example, is proof of rehabilitation. But the applicant may have done the same work before disbarment. Should he then, in the process of demonstrating "rehabilitation", work twice as long? Should one prove rehabilitation by joining the Civitan Club in addition to the Kiwanis? Should one have a religious rebirth? *How does one prove he is no longer untrustworthy?* Especially if he maintains, as has he the right, that he *never was* untrustworthy?

One might suppose that considering the tenor of the revised decision and of the dis-

sents, that a lawyer, scarred by disbarment might by, say, a heroic, painful and disfiguring sacrifice to medical experimentation, gain a quicker rehabilitation! I would vote that he stay out five years, no matter what; and that all others return in five years, if their behavior was shown law-abiding in that time.

To say that my reasoning is simply a mask for reluctance to do a difficult part of judging—that my insistence upon a provable standard for behavior that would entitle a disbarred lawyer to practice again is an avoidance of responsibility to make the subjective judgment necessary—simply turns the problem into the solution. Because the difficulty of the task—the difficulty in finding strands of logic to which to attach a reasoned decision about what one must do to regain a license to practice law, proves the ultimate subjectivity that I decry.

Such subjective judgments are simply too fraught with danger to the rule of law.

I am not going to write about the time—5 years—that the Court heretofore has determined to be the period required to be spent in disbarment. The rule that one may reapply after five years has been in our books since 1972. It may be that the time period should be ten years for those convicted of a felony, and five for those disbarred because of professional misconduct but for which there was no criminal conviction.

Neither shall I dwell upon the overlays of guilt by association that seem to touch this particular case, except to wonder whether if Bernard Smith had not been in politics connected with a corrupt state administration, he would have received the treatment by our Ethics Committee and the press and this Court, that he has.

I must, however, comment about a paragraph in the Bar's petition for rehearing that prompted withdrawal of our original opinion and substitution for it of this one:

> The [original] opinion ... in fact endangers the public, hampers the operation of the Legal Ethics Committee, outrages the public, embarrasses the Bar, and disre-

---

* One would hope never to be a subscriber to the judging philosophy of a circuit judge before whom I practiced for many years, who once

stated that if a man had a reputation for being an "SOB outside my court, he will get treated as an SOB *in* my court."

gards the standards of honor and integrity which this court has set for the profession.

This would seem an importuning of the Court to bow to public clamor, which would violate Canon 3 A(1) of the Judicial Code of Ethics:

A judge should be faithful to the law and maintain professional competence in it. He should be unswayed by partisan interests, public clamor, or fear of criticism.

I can report that none of my brethren was affected by the Bar's plea in this regard. We were responding, each in our own way, to partisan interests, public clamor, and rear of criticism *long before the original opinion in this case was even filed!* The Bar, I fear, would have "Justice" lay down her scales and make her decisions based upon comments made in newspaper editorial pages.

MILLER, Justice, dissenting.

The majority acknowledges that since its original opinion was filed on October 7, 1980, "the Ethics Committee filed a petition for rehearing, pointing out to the Court that it had incorrectly stated certain principles of law." 214 W.Va. at 85, 585 S.E.2d at 604. The majority also acknowledges that "on the Court's own motion the original opinion was withdrawn and this opinion is substituted in its place." 214 W.Va. at 85, 585 S.E.2d at 604.

I originally dissented from the majority opinion and was joined in that dissent by my brother McGraw. We both opposed the majority's action today in denying the rehearing as we feel that the Court's historical practice requires that where there is need to correct an original opinion a rehearing should be granted so that the parties can be given an opportunity to fully present their positions orally and by way of briefs on reargument.

Even though the new majority opinion suggests that it has corrected some of its initial errors, a reading of its opinion leads me to conclude that the changes are mainly cosmetic,[1] it does not correct the underlying

deficiencies in the original opinion. The chief deficiency in both the original and present opinions is that they ignore settled principles in this area of the law.

All courts uniformly recognize that the disbarment of an attorney is based on the fact that he has committed an extremely serious offense. Moreover, it is uniformly held that in order for a disbarred attorney to regain his license he bears the burden of showing that he has rehabilitated himself. We made these two points plain in our recent case of *In re Brown*, 164 W.Va. 234, 262 S.E.2d 444, 445–46 (1980):

"[I]t is incontestable that a disbarment results from the most serious ethical violations, and the courts have traditionally cast a heavy burden on the petitioning attorney to demonstrate his fitness for reinstatement. *In re Reed*, 341 So.2d 774 (Fla. 1977); *Lester v. Kentucky Bar Association*, 532 S.W.2d 435 (Ky.1976); *In re Braverman*, 271 Md. 196, 316 A.2d 246 (1974); *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975); 7 Am.Jur.2d *Attorney at Law* § 72 (1963)." (Footnote omitted) *See also* Annot. 70 A.L.R.2d 268, 297 (1960).

These two points are entirely ignored by the majority in its opinion. Without citation to a single other jurisdiction, it substitutes as a standard a new rule that an attorney need only wait out the five year period by behaving honorably and the burden is then thrust upon the Ethics Committee "to present facts and circumstances which would lead to an inference of bad character or lack of fitness to practice law or to show that the nature of the original offense was of such gravity ... that sound public policy precludes reinstatement for that reason alone." Syllabus Point 3, in part.

While the majority opinion quotes from *In re Brown, supra*, and the well recognized standards we adopted from *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975), it makes no meaningful analysis of the facts of this case within those standards.[2] Nor do they

---

1. The only change of any significance was the recognition in the third syllabus point "that the nature of the original offense was of such gravity that the likelihood of future injury to the public is sufficiently significant that sound public policy precludes reinstatement for that reason alone."

2. The majority opinion, 214 W. Va. at 85, 585 S.E.2d at 604, gives this quote from *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975):

even attempt an analysis of the facts under their new rule. Certainly, a conviction for the felony of violating the federal election laws is a serious crime that strikes at the integrity of our electoral process—the cornerstone of our democratic form of government which lawyers are sworn to uphold. It is difficult to see how petitioner can obtain reinstatement even under the majority's new rule relating to the gravity of the original offense as being sufficient to preclude immediate reinstatement. This Court in a unanimous opinion when it disbarred the petitioner Smith, *In re Smith*, 158 W.Va. 13, 206 S.E.2d 920, 922 (1974), had this to say about his underlying criminal conviction:

> "In other words, he was charged with 'stuffing' the ballot box with fraudulent and fictitious ballots.
>
> \*  \*  \*  \*  \*  \*
>
> "It has been consistently held that the conviction of a crime wherein fraud is an element involves moral turpitude. In The *Matter of Mann*, [151 W.Va. 644, 154 S.E.2d 860] *supra; In re West*, [155 W.Va. 648, 186 S.E.2d 776] *supra; In re Teitelbaum*, 13 Ill.2d 586, 150 N.E.2d 873; *In re Eaton*, 14 Ill.2d 338, 152 N.E.2d 850. The crime for which the respondent was convicted clearly involves an element of fraud, and is so stated in the indictment upon which he was tried and convicted, and thus this crime unquestionably involves moral turpitude, which makes it mandatory upon this Court to annul the license of the respondent."

The reason for the majority's new rule is obvious. It has been tailored to fit the circumstances of this case, since Mr. Smith has made no attempt to show that he has rehabil-

itated himself. During the five-year period from the date of his disbarment until his petition for reinstatement, he did little other than comply with the mandatory terms of his federal probation. He made no effort toward some gainful employment or community involvement and conceded that in the last year or two he was only waiting to see if he would be reinstated. Even the majority could hardly claim that this petition meets the burden of showing rehabilitation which courts uniformly place on petitioner. As a consequence it had to invent a new rule in order to reinstate Mr. Smith.

It is appalling that the majority would entirely ignore the recommendations of the Ethics Committee who heard the witnesses and made findings of fact in regard to Mr. Smith's reinstatement. The Committee unanimously concluded that at the present time he should not be reinstated.[3] Most courts have held that findings of the Legal Ethics Committee upon reinstatement hearings should be accorded considerable weight. *Tardiff v. State Bar*, 27 Cal.3d 395, 165 Cal. Rptr. 829, 612 P.2d 919 (1980); *In re Wigoda*, 77 Ill.2d 154, 32 Ill.Dec. 341, 395 N.E.2d 571 (1979); *In re Hiss*, 368 Mass. 447, 333 N.E.2d 429 (1975); *In The Matter of Freedman*, 406 Mich. 256, 277 N.W.2d 635 (1979); *Petition of Harrington*, 134 Vt. 549, 367 A.2d 161 (1976). The rule has been stated in this fashion in *In re Hiss, supra:*

> "In any disciplinary proceeding the findings and recommendations of the board, though not binding on this court, are entitled to great weight. See *March v. Committee of Bar Examrs.*, 67 Cal.2d 718, 720, 63 Cal.Rptr. 399, 433 P.2d 191 (1967); *In the Matter of Bennethum*, 278 A.2d 831,

---

"In judging whether a petitioner satisfies these standards and has demonstrated the requisite rehabilitation since disbarment, it is necessary to look to (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills. (Citations omitted.)"

**3.** The final paragraph of the Ethics Committee's Report had this summary:

"The Committee believes that in view of the nature of the offense for which Smith was convicted, the position of prominence and trust which he occupied at the time of the commission of that offense, his reinstatement would be harmful to the administration of justice, and would lower confidence in the integrity of the courts, and would be damaging to the efforts of the bar and its efforts to police the profession and to the whole judicial system and would be incompatible with the public interest and welfare."

833 (Del.1971); *Petition of Eddleman,* 77 Wash.2d 42, 43, 459 P.2d 387 (1969). Cf. *In re Application of Strand,* 259 Minn. 379, 381, 107 N.W.2d 518 (1961). The board has heard testimony and observed witnesses and, by virtue of this firsthand observation, is better able than a reviewing court to judge the relative credibilities of witnesses and to assign weight to the evidence they give." [368 Mass. at 461, 333 N.E.2d at 438 (footnote omitted)]

I find nothing in the report and findings of the Ethics Committee that leads me to conclude that it made any mistakes in analyzing the evidence or made any errors of law in applying the evidence to the settled legal principles that we announced in *In re Brown, supra.* It is difficult for me to believe that the Ethics Committee which is itself basically composed of lawyers is totally insensitive to the position of a disbarred attorney.[4] As a matter of fact, much of the criticism leveled at the Bar by the public and press is that since its disciplinary proceedings are controlled largely by its own members there is a great tendency to be too lenient in disciplinary matters.[5] Here the majority compounds the problem by not only substituting its judgment of the facts for that of the Ethics Committee's, but also has totally warped the law by removing the burden of proving rehabilitation from the applicant and casting the responsibility for showing bad character on the Ethics Committee.

The majority obliterates the high ethical and moral standards that are demanded in the practice of law by the West Virginia Code of Professional Responsibility.[6] For example, Disciplinary Rules 1–102 and 6–101 require:

"DR 1–102 Misconduct.

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(2) Circumvent a Disciplinary Rule through actions of another.

(3) Engage in illegal conduct involving moral turpitude.

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

"DR 6–101 Failing to Act Competently.

(A) A lawyer shall not:

(1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him."

The majority ignores the concept that disciplinary proceedings cannot be analogized to a criminal punishment since the license to practice is a privilege, which can be withdrawn if the practitioner abandons the professional standards. We have consistently stated that an attorney disciplinary proceeding is neither a civil action nor a criminal proceeding because its primary purpose is "to preserve and protect courts of justice and the public from the official ministrations of persons unfit to practice." *In re Brown,* 157 W.Va. 1, 7–8, 197 S.E.2d 814, 818 (1973), *quoting* 7 C.J.S. *Attorney and Client,* § 28. *See also, Committee on Legal Ethics v. Pence,* 161 W.Va. 240, 240 S.E.2d 668, 673 (1977); Syl. Pt. 2, *Committee on Legal Ethics v. Graziani,* 157 W.Va. 167, 200 S.E.2d 353 (1973), *cert. denied,* 416 U.S. 995, 94 S.Ct. 2410, 40 L.Ed.2d 774 (1974).

---

4. As a result of an amendment to the State Bar By–Laws adopted April 3, 1979, three nonlawyers were appointed to the nine-member Ethics Committee over a three-year period. By–Laws of the West Virginia State Bar, Article VI, Section 5.

5. *See, e.g.,* Woolfram, *Barriers to Effective Public Participation in Regulation of the Legal Profes-*

*sion,* 62 Minn. L.Rev. 619 (1978); *see also* Waltz, *The Unpopularity of Lawyers in America,* 25 Clev. St. L.Rev. 143 (1976); Pound, *The Lay Tradition As To The Lawyer,* 12 Mich. L.Rev. 627 (1914).

6. The West Virginia Code of Professional Responsibility is substantially the same as the American Bar Association's Model Code, which has been adopted in virtually all states.

We, as well as other courts, have recognized that the courts have a duty to ensure that persons granted the right to practice law are appropriately qualified to carry out what is essentially a fiduciary duty to their clients, the courts, and the public administration of justice. In *West Virginia State Bar v. Earley*, 144 W.Va. 504, 531, 109 S.E.2d 420, 437 (1959), we quoted these principles from an earlier case:

"In the more recent proceeding of *In re Eary*, 134 W.Va. 204, 58 S.E.2d 647, the opinion contains this statement: 'This Court has the inherent power to grant or refuse a license to practice law.' The opinion also uses this language: 'It is the duty of this Court to scrutinize carefully the qualifications of persons who seek to be admitted to practice before the courts of this State, in order that the public may be protected and the courts assisted in the discharge of the vital duties of the administration of law and the resolving of legal controversies. If this Court permits persons to enter the profession of the law who do not have the requisite moral qualifications, it would result in debasing the profession and would bring disrepute upon the administration of justice. Thereby, the confidence of the people in their courts would be destroyed. This we cannot permit.' "

Much the same thoughts were stated by the Kentucky Court in *In re Stump*, 272 Ky. 593, 114 S.W.2d 1094 (1938), in regard to the principles surrounding reinstatement for a disbarred attorney:

"The ultimate and decisive question is always whether the applicant is now of good moral character and is a fit and proper person to be reintrusted with the confidences and privileges of an attorney at law. This question has a broader significance than its purely personal aspect. From time immemorial lawyers have in a peculiar sense been regarded as officers of the court. It is a lawyer's obligation to participate in upholding the integrity, dignity, and purity of the courts. He owes a definite responsibility to the public in the proper administration of justice. It is of utmost importance that the honor and integrity of the legal profession should be preserved and that the lives of its members be without reproach. The malpractice of one reflects dishonor not only upon his brethren, but upon the courts themselves, and creates among the people a distrust of the courts and the bar." (272 Ky. at 598, 114 S.W.2d at 1097)

*See also Matter of Raimondi*, 285 Md. 607, 403 A.2d 1234 (1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 705, 62 L.Ed.2d 669 (1980); *Petition of Emmons*, 330 Mich. 303, 47 N.W.2d 620 (1951); *State v. Butterfield*, 172 Neb. 645, 111 N.W.2d 543 (1961).

For the majority to cast aside these concepts and conclude that disbarment is exacting punishment and vengeance on the attorney perverts the entire disciplinary process. No court has adopted this view, and for sound reasons. Disbarment does not strip an attorney from earning a livelihood. It precludes him from the practice of the legal profession. There is little doubt that with a college degree and his legal training he is amply qualified for many positions in industry, marketing and business, without the necessity of considering something less than a "white collar" job.

The loss of the license to practice arises not because of some mystical concept that we exact "vengeance," but on the very real and practical judgment that the attorney has failed to meet professional standards as a result of proven facts concerning his delinquent conduct. This concept is not peculiar to the legal profession but is well known to the medical profession as well as others.

For the majority to buttress its vengeance argument by citing a juvenile case, *State ex rel. D.D.H. v. Dostert*, 165 W.Va. 448, 269 S.E.2d 401 (1980), demonstrates its failure to grasp the key principles involved. Juveniles who have committed acts of delinquency have by statute and our case interpretations been accorded leniency because the law recognizes that they are young and immature. It is because of their youth and immaturity that the law determines they should not be punished as adults. Furthermore, because of their youth, there exists a substantial possibility of rehabilitation. These principles bear little relationship to attorney disbarment

where we are confronted with mature, highly-educated adults who have committed crimes involving moral turpitude.

I cannot blind myself, as does the majority, to the petitioner's prior disciplinary record before this court, a factor which other courts have also considered. *E.g. Committee on Professional Ethics v. Wilson*, 290 N.W.2d 17, 23 (Iowa1980); *In re Riccardi*, 80 Cal. App. 66, 74, 251 P. 650, 653 (1926).

In *Committee on Legal Ethics v. Smith*, 156 W.Va. 471, 194 S.E.2d 665 (1973), this same petitioner appealed the Ethics Committee's recommendation that he be given a 30-day suspension or public reprimand for failing to return retainer money to an out-of-state client after petitioner neglected to take any action on the client's claim. According to this statement in the opinion:

> "[a]t no time during the period of time involved did the defendant take any action to prosecute the Lentz claim. He instituted no suit; he did not inform anyone connected with the Logan Coca Cola Bottling Company that he had been retained; he did not seek an accounting; he did not attempt to find any information on which to file a suit or to negotiate settlement." (156 W.Va. at 473–74, 194 S.E.2d at 667)

After considering petitioner's defense to the effect that he had had health problems and was heavily involved in litigation in various courts as an attorney and as a criminal defendant, this Court declined to order suspension but did issue a public reprimand.

Finally, I am troubled by the majority's blithe assumption that it knows better than the Ethics Committee what is best for attorneys. This Court sees only a small fraction of the disciplinary cases that are handled by that Committee, since it is only the serious penalties that are appealed to us. The Ethics Committee has not been draconian in its approach to disciplinary cases. The Bar By-Laws provide a humane treatment for those attorneys who commit ethical violations while under the stress of mental or emotional dis-

ability.[7] Anyone familiar with the practice of law recognizes that its demands for dedication and service can impose severe emotional burdens on an attorney. Where misconduct has resulted from this situation, the Ethics Committee, upon independent verification by physicians or psychiatrists of the legitimacy of the emotional problems, has not pressed for total disbarment but rather a suspension until the attorney regains his health.

To my knowledge, we have had only one other reinstatement case where we have ignored the recommendations of the State Bar Ethics Committee. *In re Daniel*, 153 W.Va. 839, 173 S.E.2d 153 (1970). We overrode the recommendations and reinstated Mr. Daniel to the practice of law only to discover that he then committed disciplinary infractions after reinstatement and had to be suspended from the practice again. *Committee on Legal Ethics v. Daniel*, 160 W.Va. 388, 235 S.E.2d 369 (1977).

I do not maintain that the petitioner, Mr. Smith, is never entitled to be reinstated. I do maintain that on the present record he has not carried his burden of showing rehabilitation. His failure to establish after disbarment any meaningful social or work pattern in his community, coupled with the gravity of his initial offense, which was a crime against the election process, and his prior disciplinary record leads me to conclude that the Ethics Committee is correct in recommending against reinstatement.

The majority does a grave disservice to the legal profession, the public at large, and to this Court by its opinion.

I am authorized to state that Justice McGRAW joins me in this dissent.

---

7. By–Laws of The West Virginia State Bar, Article VI, Section 26.