## In Re Anonymous No. 2 D.B. 75

Disciplinary Board Docket no. 2 D.B. 75.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania

HARRINGTON, *Chairman,* March 31, 1982—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Discipli-

nary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above petition for reinstatement.

## I. HISTORY

The petition of [Petitioner] hereinafter referred to as petitioner for reinstatement comes to your honorable court with the unanimous recommendation of the board that the petition be granted. On December 30, 1974, petitioner was sentenced in the United States District Court for the Western District of Pennsylvania at Criminal No. [ ] to a term of three months to three years upon his conviction for mail fraud related to his practice of law.[1]

Upon receipt of certification of conviction, petitioner was suspended by your honorable court effective February 13, 1975. The board was directed to commence proceedings to investigate and make recommendations concerning the type of discipline to be imposed on petitioner. On August 9, 1977, petitioner was disbarred by resignation and consent. On February 24, 1981, the Supreme Court of Pennsylvania granted petitioner leave to apply for reinstatement.[2]

On June 16, 1981, the petition for reinstatement was referred to hearing committee [ ]. A hearing was held September 9 and 10, 1981, at which time petitioner was represented by [A], of the [ ] Bar,

---

1. The sentence was later modified to a term of three months in jail and three years probation.

2. The court permitted the timing of the period of disbarment to be read to commence with the date of the initial suspension. More than six years passed between the date of petitioner's suspension and the date on which he filed the petition for reinstatement.

and the Office of Disciplinary Counsel was represented by [   ], Assistant Disciplinary Counsel. Testimony was taken from 13 witnesses called by petitioner and the deposition of [B], M.D. was offered into the record. Some 15 exhibits were received into evidence after being offered by petitioner. Disciplinary Counsel did not call any witnesses nor offer any exhibits. Disciplinary Counsel limited his challenge to petitioner's evidence by cross-examination of petitioner's witnesses and arguments to the hearing committee that petitioner was burdened by very large outstanding financial obligations as well as arguing some procedural matters, all of which were resolved in favor of petitioner.

The hearing committee in its report filed January 15, 1982, found:

"It is the finding of the Committee that although faced with numerous problems, many of which were self-induced, the evidence indicates a continued integrity of the Petitioner, [   ]. Further, it is the opinion of the Hearing Members, based on all of the evidence, that the Petitioner exhibited a sincere and dedicated interest in preserving the integrity of the Bar as well as the safety and well-being of his clients in their respective causes.

The hearing committee unanimously recommended:

"It is with due deliberation and consideration of all of the abovementioned, that this Committee recommends the Petition of [Petitioner] be granted and that he unconditionally be reinstated to practice before the Court of the Commonwealth of Pennsylvania." id. (Hearing Committee Recommendation Page 10)

No exceptions were filed by Disciplinary Counsel to this finding and recommendation.

## II. FACTS

Petitioner, [  ], was born January 17, 1928, in Glassport, Pa., and is now 54 years of age. He is the father of two sons, James 24 and David 19. He is presently unmarried and resides at [  ], Pa.

He was graduated from the University of Pittsburgh in June, 1948, with a B.A. Degree and in June, 1951, from the same university's Law School with a LL.B. In March, 1952, he was admitted to the practice of law in the several courts in Pennsylvania.

From July, 1951, to June, 1952, he was employed as a law clerk by the late Honorable [C], a Judge of the Court of Common Pleas of Allegheny County. In June, 1952, petitioner became a private practitioner and continued as such until he sold the practice to [D] Esq., in June, 1974.

In August, 1974, petitioner was indicted on seven counts of using the mails to defraud. The case was tried to verdict before Honorable [E], District Judge, and a jury. A verdict of not guilty was returned on five of the seven counts and guilty on two counts. Petitioner was sentenced to and served three months at Allenwood State Prison and a period of probation which was terminated February 2, 1979, by order of court on recommendation of the United States Probation Officer.

Supporting the conviction were the facts that petitioner represented [F] in a claim for damages resulting from personal injuries. The case was settled and the proceeds paid to petitioner. He cashed the checks and commingled the funds. When his client demanded payment, petitioner sent two checks totaling $5000, characterizing them as "Loans", and

telling his client she could not get the settlement proceeds because there were domestic problems between her and her husband. (T-277, Indictment at 74-258 Criminal Counts 2, 3) All of the money due to [F] from the settlement was later paid in full.

As a result of his conviction on charges of mail fraud, petitioner was suspended from the practice of law until August, 1977, when he resigned from the bar and was disbarred with consent.

While the [F] matter became the most notorious of the charges against petitioner, it was certainly not the only one. There were other complaints of neglect and refusal to deliver entrusted funds (Petition for Reinstatement Appendix "D").

The record reveals that petitioner was not always a dilatory unethical practitioner. In fact when petitioner was admitted, he brought to the practice of law some skill and a great deal of energy and determination. He rapidly built a busy practice and met with considerable success in the preparation and trial of criminal and civil cases. He was financially successful. He purchased a building in downtown [ ], in which he set up his law office. He bought farm property in nearby [ ] Counties and purchased livestock to put on the farms. He purchased residential property in the City of [ ] in several locations.

After some 17 years of building a reputation for professional competence, petitioner developed drinking habits that unfavorably affected every facet of his life. For the next six years, the quality of that life deteriorated to such an extent that by August, 1979, he was a professional, moral, social bankrupt. In the petition for reinstatement in answer to Question No. 21, petitioner describes his condition as follows:

"Under the combined affect of alcohol and drugs, I lost the ability to function effectively and began staying away from my office for long periods of time. I began to delegate the management of a large law practice to others. Unfortunately, intemperance and absentee management only led to mismanagement of my clients affairs as well as my own."

"So day after day, it was the same pattern. I left important decisions to others. I had nine (9) or ten (10) people working for me at one time. I had a lot of good friends in the legal profession. I lost them."

" . . . , by staying away from the office and like any business with an absentee management, it wouldn't work. It didn't work in my case. It just got worse and worse. Finally, it exploded into what we are seeing today."

He incurred financial obligations of considerable size that he could not or would not pay. (Petition for Reinstatement Appendix "A")

Domestically petitioner and his wife found living together extremely unpleasant. They later separated and were divorced. Petitioner described his condition at this time " . . . I was a mess. I was a disgrace. I was . . . imagine the worse and that's what I was . . . "

On March 12, 1974, petitioner attempted suicide by consuming a large number of Deprol tablets while drinking substantial amounts of alcohol. He was found in the bathroom of his home and taken to North Hills Passavant Hospital where he was resuscitated and treated for depression. Four months later petitioner was admitted to the Washington Hospital "drunk and disheveled." His condition was diagnosed as "acute alcoholism." He was treated with physiotherapy and medication but left

the hospital against medical advice on the second day after admission. (Excerpts from the charts of both hospitals have been marked "A" and "B" and attached as exhibits to petition for leave to apply for reinstatement with credit on disbarment time for time served in suspension.)

Petitioner continued in his pattern of alcoholic drinking for several years, during which time the criminal trial took place. His appeals were exhausted, and he served the sentence imposed. He was unable to find a job. He was living under the most uncomfortable of circumstances and near despair. (Petition for Reinstatement Question No. 21)

By the very terms of his probation, petitioner was not permitted to " . . . accept any employment in any law office or employment by any attorney at law as an investigator or law clerk during the period of probation:" (Order of Court June 24, 1976) This order, or course, took away from petitioner any possibility of obtaining employment in the profession or related field with which he was acquainted and in which he was trained.

At this lowest point in his life, petitioner found some determination to do something about his condition. He quit drinking and became a member of Alcoholics Anonymous. As he became sober, he "rediscover[ed] old values and standards." He obtained employment as a part-time faculty member at [ ] College. He renewed his efforts to pay off his creditors. He made an effort to re-establish moral values by renewing his faith in "the Almighty."

Soon after probation was terminated, petitioner sought out legally related employment as an investigator and a legal researcher. (Petition for Reinstatement Appendix "H") Since that time, he has maintained a familiarity with developments in the law and has participated in several seminar

programs. In his capacity as a teacher of criminal law and criminal procedure, petitioner is studying the current law and keeping an attentive eye on developments in those fields. Since December, 1980, petitioner has organized the [    ] College Prison Project, working with students under the supervision of the West Virginia Legal Services Plan. He has engaged in several other endeavors related to helping prisoners make the transition from incarceration to freedom.

At the present time, petitioner has settled all money claims against him except those listed in the petition for reinstatement exhibit "F". Those obligations will be paid in full or nearly so within the near future from proceeds of the sale of certain property. Large Internal Revenue Service liens in the nature of jeopardy assessments are being contested by petitioner, apparently with some expectation of success. The money from the proposed sale of a farm owned by petitioner will be put in trust and is already assigned to pay off creditors listed in Appendix "F." In order to make certain that all of those persons who have been harmed by petitioner or anyone acting on his behalf have been located, a search of disciplinary records has been made and all persons making claims against petitioner have been sought out and an effort made to pay in full or settle any claims against him. In the process, petitioner has liquidated all of his assets necessary to discharge his obligations to his former clients. Nothing has been isolated from the claims of his creditors.

In presenting evidence in support of his petition for reinstatement, petitioner was obviously aware of his burden to produce clear and convincing testimony. In an effort to do so, he called to testify [G], Assistant Professor of Sociology and Anthropology

and the Director of Appalachian Studies at [   ] College. [G] was also Chairperson of the department of Social Science of which the Criminal Justice Program is a part. Also called to the stand was [H] President of [   ] College, a chemist who holds the degree of Doctor in Physical Chemistry. In addition, [I], Assistant Professor and Director of the Criminal Justice Program at [   ] College, was called to testify. In order not to burden the record by a detailed account of the testimony of those witnesses, it is sufficient to note that petitioner had explained in explicit terms before he was given the job at [   ] College the precise nature and extent of the problems in his life up until that time. After four semesters of close association with petitioner, these several witnesses were high in their praise of him. They testified in " . . . he gives a lot more than, I guess, the school can really expect of a part-time teacher . . . " (T-12) "So as I say, I had been extremely pleased with petitioner's teaching and especially his relationship with the students and also his general relationship with other members of the faculty."

" . . . I have had a chance to see him in his own home: dealing with other students: dealing with his colleagues: dealing with myself both professionally and on a more informal basis. I feel quite comfortable and also quite happy . . . that he had come a long way from what apparently was the depth in 1974 or earlier and the way I knew him beginning in the Spring of 1980." "I certainly am happy that he teaches on my faculty. I am happy that I am his friend and I have great confidence that he is certainly a credit to the legal profession . . . therefore, I would have no hesitation in terms of saying that I feel that he would certainly continue to give credit and honor to the law if he were readmitted to the

Bar." "I think the most striking experience I have had was a few months ago when I saw the performance of a play that he (petitioner) had written and directed and was put on by our students at our Honors Convocation." "I would like to say that [Petitioner] has a tremendous contribution to make and his background, his recent experience over the last six years has given him a sensitivity and a depth which most of us probably would not be able to bring to a situation. So, I would be willing to bet very strongly on his future."

[J], Esq., of the [ ] County Bar, testified that petitioner had performed legal research and investigation and was highly competent in those fields. The witness is a trustee of funds assigned from the sale of property that will pay all or substantially all of petitioner's debts, save the government obligations.

[K], a Real Estate Appraiser, of [ ] Street in [ ], testified that he had known petitioner for 25 years. He went on to say that he had handled real estate matters for the petitioner and currently has under agreement to sell for petitioner 175 acres of farm land. Proceeds from the sale have been assigned and will be placed in trust for creditors.

Petitioner called his son, a medical doctor, who described the uncomfortable family relationship from 1968 or 1969 up through the mid 70's. He made a comparison between those bad times and the very substantial, remarkable change in his father's personality after 1979 and up until the present time.

The sister of petitioner was called and testified that her brother was much more mentally alert, more disciplined, a much better person now than he had been during the time in his life when he was experiencing various troubles.

[L] Esq., of the [  ] County Bar, testified that he had known petitioner for many years and recently his experience was one that established petitioner's competence in legally related activities with which he was familiar.

## DISCUSSION

The Pennsylvania Rules of Disciplinary Enforcement provide that a disbarred attorney shall have the burden of demonstrating by clear and convincing evidence that such a person has the moral qualifications, competency, and learning in law required for admission to practice law in this Commonwealth and that the resumption of the practice of law within the Commonwealth by such person will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest: Pa.R.D.E. 218(c)(3)(i). In further interpreting its Rule, The Supreme Court in a per curiam opinion describes the reinstatement procedure as follows:

"A reinstatement proceeding is a searching inquiry into a lawyer's present professional and moral fitness to resume the practice of law. The object of concern is not solely the transgressions which gave rise to the lawyer's suspension or disbarment, but rather the nature and extent of the rehabilitative efforts he has made since the time the sanctions were imposed, and the degree of success achieved in the rehabilitative process." Philadelphia News, Inc. v. Disciplinary Board, 363 A. 2d 779, 780, 781.

In the 445 pages of testimony before the hearing committee there was, without doubt, a meticulous airing of all charges or rumors of impropriety raised against petitioner. That testimony, together with the scores of pages of exhibits, convinced all mem-

bers of the hearing committee and all members of the board that petitioner has indeed convincingly carried the burden of proof and can be recommended to your honorable court for reinstatement.

It is suggested that one of the standards by which attorney's competency and learning in the law may be judged is by observing the level of those attributes possessed by the formerly admitted attorney while he was still practicing. Petitioner in this case had built an active general practice, a substantial part of which was the preparation and trial of cases in the civil and criminal courts. He had achieved a reputation among members of the bar and the bench as a well-qualified, well-prepared trial lawyer. He represented a substantial number of clients, which according to his testimony at one time, numbered in the hundreds. To the extent that competence may be measured by financial success achieved from the practice of law, he was, indeed, competent.

Petitioner's current level of learning in the law is easier to document than that previously held by him. He is teaching courses in criminal law and procedure at [   ] College. He is well regarded by his superiors and his students insofar as his knowledge of the subject is concerned. He is doing paralegal work for several attorneys and is performing in a highly professional and satisfactory manner. He has made an effort to keep current with developments in the law and legal procedures generally. He has available to use, and does use, law reports and journals. It is apparent that petitioner is competent and learned in the law.

When considering evidence that resumption of practice by a formerly admitted attorney will not be detrimental to the integrity and standing of the bar or of the administration of justice, the hearing

committee, Disciplinary Board, and the court must be acquainted with the nature of the offenses for which petitioner was disciplined. In this case the offenses were grievous, and petitioner has served the criminal sentence imposed by the Trial Judge. He has, likewise, served a period of suspension and disbarment of more than seven years. However " . . . the main thrust of the proceeding (petition for reinstatement) is whether the disciplined attorney is now morally fit and technically competent to engage in the practice of law." Philadelphia News, Inc. v. Disciplinary Board, supra 781, footnote 6.

Why petitioner misbehaved is of interest to the fact finders when determining the nature of discipline to recommend to the court. His current attitude and conduct is of more substantial interest in determining whether such person has corrected the character defect or personality trait or life circumstance that influenced his aberrancy. The fact finder may be assisted in arriving at that conclusion by examining petitioner's conduct since his separation from the practice of law: In Re Smith, 270 S.E. 2d 768 (1980). Petitioner's evidence depicts him as a chronic alcoholic who, while drinking, acted in an irresponsible manner detrimental to the integrity and standing of the bar. He has changed his pattern of conduct by not drinking and by adopting the program of Alcoholics Anonymous. He claims the results have been dramatic. Order has been restored to a chaotic life. A sense of responsibility, professional and social, has replaced old habits controlled entirely by self-gratification and riotous self-will. All of this may be true but without more than petitioner's assertions, it would be difficult to accept this conversion from the old to the new way of life. In this the case petitioner has offered more, much more.

Petitioner offered the deposition of [B], M.D., who has specialized in psychiatry, and was stipulated to by Disciplinary Counsel as "an expert in the field of alcoholism . . . " (Deposition-5) In a carefully conducted examination, petitioner's counsel elicited information from [B] that is helpful is assessing the significance and importance of petitioner's claim that his conduct was affected by excessive drinking. When asked to express his opinion arrived at as a result of his examination of petitioner, the Doctor testified:

"The history, as he had given it to me, was fairly typical and characteristic of the problems of severe alcoholism with all the consequences which alcoholism can cause.

I feel that there is every reason to believe that in the absence of use of alcohol or any other similar substance, that (Petitioner) would not have any of the behavorial problems that he had at the time he was drinking or using the tranquilizing or sedative substances." (D-8)

"After total abstinence, when the addictive behavior is discontinued, judgment can return to complete normalcy." (D-12)

Supported by highly competent scientific opinion and observation by lay persons, the board is satisfied that petitioner does not have organic brain damage and can, if given the opportunity, conduct a satisfactory, competent, ethical practice in the law.

In his deposition, the doctor outlines the program for recovery.[3]

---

3. "Q. Doctor, would you tell us, in your view, what is involved in recovery from alcoholism.

A. The sine qua non of recovery is total abstinence. Without that, there is, in my mind, no recovery, since I be-

To further corroborate his own testimony, petitioner called to the witness stand a practicing attorney of some 22 years at the bar and an acquaintance of petitioner since 1966, and a member of Alcoholics Anonymous for more than 19 years. That attorney explained in considerable detail the way in which Alcoholics Anonymous can be used to assist an alcoholic in not drinking and in establishing a life-style compatible with sociably sane conduct. He described some of his own experiences as an addictive drinker, and the effect it had on his life. That testimony was strikingly similar to the effect that heavy drinking had had on petitioner's life. The witness described the Alcoholics Anonymous Program and the way it works. He testified

lieve that once the person has crossed the line and has become an alcoholic, there is no way to go back to safe social drinking. So, it calls for total abstinence.

But total abstinence is the beginning. The continuation and the growth in the recovery, essentially, involves a kind of personality change.

If I may just elaborate on that a little bit, it's best exemplified by a former drinker who, after twenty (20) years of sobriety, says the man that I was drank, and the man that I was will drink again.

So that, abstinence in itself is not sufficient, but a person has to undergo some personality adjustment so that he is no longer going to be that person who drank the way he did at one time . . .

The only way that I have seen, in my years of experience, that this is achievable, is through participation and fully working in the program of Alcoholic Anonymous.

The experience of programs, the accumulation of decades of hard-won experience of what is effective and what is not effective, has provided a method of growth to reach that kind of personality adjustment, where the person is no longer the person who took the first drink.

So, its not only that we have a former drinker who no longer is drinking, we have a totally different person than the one who used to take the drink." (D-13-15)

further that he had observed petitioner attending meetings and was able to evaluate, to the extent that any lay person can, the substantial change for the better in petitioner's attitude and conduct. He testified:

"(Petitioner), I know, has been doing the things that I told him to do. One of the reasons why I know that is because in his area, I called and asked an Alcoholics Anonymous member if he is doing it, and he said that he is. So that's why I'm here because he's doing these things. The power of Alcoholics Anonymous is enormous. Peoples lives have been reformed and changed as a result of this. It is an interesting twentieth century phenomenon. It is just unbelievable.

Q. Have you, in the past sixteen (16) months, developed your own assessment of the quality of Mr. _____ (petitioner's) recovery as well.

A. Yes, when (petitioner) first came to me, I thought to myself, if I were disbarred or if I was in prison or if I was anywhere; going to Alcoholics Anonymous would be a factor in getting me back to where I wanted to be I would go to Alcoholics Anonymous.

So that when he came to me, that naturally crossed my mind. So I watched him. I gave him things to do and if you are not sincere about wanting to change your life, you cannot do the program Alcoholics Anonymous because it is just too rigorous. It is too difficult.

You must be motivated and strongly motivated to change. Because he has done these things, and I know if he has done them or not done them by questions that I can ask him. I ask him these questions and I am convinced that he is doing them. Then it is not me that's going to change his life or I

don't have the responsibility for his life or his sobriety. That comes out of the program, Alcoholics Anonymous."

The hearing committee and the board are well-satisfied that petitioner's rehabilitative efforts have been successful and that he is recovering from the disease of alcoholism and is fit for reinstatement.

One area in which Disciplinary Counsel evidenced some concern about information contained in the petition for reinstatement dealt with petitioner's fiscal responsibility. This is a matter to which a substantial part of the record was devoted, and the attention to which very much impressed the board. At various times since his admission to practice, judgment liens have been filed against him in substantial numbers. The amounts of money claimed as due and owing to his various creditor's could be measured in the scores of thousands of dollars. Few of these claims, incidentally, were related to defalcation of clients' funds. Petitioner has offered evidence to show that he has paid or almost paid all of those debts excepting Internal Revenue Service liens. The Internal Revenue Service claims are being challenged by petitioner and when reviewed from a less than expert tax background, it appears that petitioner's position has substantial merit.

The board is aware of the substantial responsibility imposed upon it in making a favorable recommendation for reinstatement. No member of the board desires to be instrumental in giving an unworthy petitioner an opportunity to inflict wrongs on the public. A favorable recommendation must be exercised with caution but in just cases, exercised nevertheless. When the requirements set

forth in Rule 218 have been fulfilled as they have been in this case, petitioner must be recommended for reinstatement. Neither the board nor any human agency can guarantee the future conduct of this petitioner or any other human being. If petitioner breaches his duties to the court and to the public, he will again be brought into the Disciplinary System, a circumstance that faces every practicing lawyer. That possibility, however, did not persuade the hearing committee to avoid its responsibility in recommending reinstatement when the facts obviously demanded that be done. The board in its turn has evaluated this case pursuant to the criteria set forth in In Re Barton, 273 Md. 377, 379, 329 A. 2d 102 (1974) . . . " (I) the nature and circumstances of the original misconducts: (II) petitioner's subsequent conduct and reformation; (III) his present character; and (IV) his present qualifications and competence to practice law." This petitioner has qualified in each category.

In several cases, the board has been asked to deal with complaints where alcoholism was a strong contributing cause. In certain of those cases, alcoholism was treated as an extenuating circumstance: In Re Anonymous No. 5 D.B.74, 4 D. & C. 3d 655, 7 D. & C. 3d 23 (1978), In Re Anonymous 8 D.B. 76, 4 D. & C. 3d 381, 12 D. & C. 3d 417 (1978), In Re Anonymous 15 D.B. 79, 25 D.B. 79, 1 D.B. 80.

In no case, however, and certainly not in the current case should the action of the board in recommending reinstatement be misperceived as accepting alcoholism as an excuse for violation of Disciplinary Rules. In a case that bears a striking similarity to the present matter, the Supreme Court of Illinois wrote:

"Perhaps in rare cases, alcoholism might so change the character of the misconduct or so distort the attorney's state of mind as to provide a complete excuse. Usually, however, alcoholism is at most an extenuating circumstance, a mitigating fact, not an excuse. The attorney's impaired judgment diminishes the responsibility he must bear, but does not eliminate it. Not all alcoholics appropriate the money of their clients; the slide from drink to dishonor may be smooth, but is neither automatic nor uncontrollable. We can understand it; we cannot excuse it or overlook misconduct as serious as respondent's. Alcoholics need not be treated just like other people; our duty to uphold the standards and reputation of the profession is not incompatible with sympathy and leniency for victims of alcoholism. But their tragedy cannot be used as a license to exploit clients by taking their money." In Re James Francis Driscoll, an attorney D-53785, Opinion dated May 11, 1981.

Conduct detrimental to the administration of justice should not and will not be tolerated whether such conduct is caused by alcoholism or some other physical or emotional disorder. Should it appear from the record that petitioner's reinstatement will be subversive of the public interest, the board would strongly recommend that such a petition be denied: In Re Stump, 272 KY. 593, 114 S.W. 2d 1094 (1938) Our recommendation for reinstatement does not carry with it the unqualified pronouncement that all who plead alcoholism as an excuse for unethical conduct will be recommended for reinstatement without substantial evidence to support that allegation. But where evidence is presented in a clear and convincing manner, and the burden of proof has been met there, the recovering

alcoholic should be confident that his explanation will be given the consideration given to other reasonable explanations.

In the instant case, an evaluation of petitioner's rehabilitative efforts strongly suggests that his reinstatement will not adversely affect the public interest. In the opinion of some who have testified in a creditable fashion, his reinstatement will be favorable to public interest. In the past, petitioner has been neglectful, dishonest, and fiscally irresponsible. All of the evidence now clearly points to a reversal of his "old ways" and a favorable change in attitude and personal habits has taken place. The witnesses who dealt with petitioner in the mid 70's were straightforward in their testimony describing his anti-social attitude and unprofessional conduct. The same witnesses were just as quick to describe petitioner's change and his current attitude and conduct. His son testified "his temper got very quick with me. He would tend to, oh, perhaps ignore work duties." The witness then gratefully described the change in his father and concluded that by saying "this is really the first time in my life that I have felt close to him, that I can actually . . . we can discuss the whole range of issues."

[M] became acquainted with petitioner when [M] was an Assistant United States Attorney. He classified petitioner at that time as an "excellent attorney." Later [M] became Assistant Disciplinary Counsel in District [   ] and continued his relationship with petitioner but from a different point of view. It became [M's] responsibility to recommend discipline as a result of several complaints filed against petitioner. [M] then was able to follow petitioner's progress in his rehabilitation and said:

"He came to our office on various occasions, over the last nine (9) months, I would say, at least once a

week. He assisted me in certain legal work that I was doing. I had found that he was very, very good in his legal research. He read intensively and extensively in various legal publications, newspapers, and magazines. We worked on various, specific cases. He was able to come up with law that was very helpful in these cases that he found through his reading."

The same witness testified:

"in fact if Petitioner is readmitted, well, I told him we would be glad to have him join us in the office with [ ] and myself. We would be glad to have him come in there as a lawyer."

In response to questions asked by a hearing committee member, the witness, [M], answered:

"I stated that I think he should be readmitted. I don't think it would be a detriment to the Bar . . . I can see he has rehabilitated himself. He is not the same man he was in the late 60's and early 70's. He is the same man he was back in the late 50's and the early 60's, and I knew him very well as a competent attorney."

[N], Esq., a Vice President of the [ ] County Bar Association and Chairman of the Family Law Section of the Pennsylvania Bar Association, who represented petitioner's wife in a protracted divorce action and property settlement testified as follows:

"I can only say that the negotiations that I had with him . . . , on the level of representing his wife, led me to believe that he was a worthy adversary. He knew the law. He studied it. I would say if he were readmitted, that I would welcome the opportunity to try a case with him because I think he is competent and able.

I found nothing in his own reputation or anything

that went on here that would cause me to have distrusted him." Attorney [N] went on to say that he had no reason to believe that petitioner would if readmitted do anything underhanded or to take advantage of opposing counsel or his clients.

In addition to witnesses called to the stand by petitioner, written testimonials from respected members of the bar and others were received in evidence. In each the writer expressed some sentiment favorable to petitioner.

Petitioner has met the requirements set forth in our rules and is qualified for reinstatement.

## RECOMMENDATION

This board respectfully recommends to your honorable court that the petition of [Petitioner], a formerly admitted attorney, be granted and that petitioner be reinstated as a member of the bar of the Commonwealth of Pennsylvania on the payment of all costs in and accordance with court rules.

Messrs. Daniels and Elliott did not participate in the adjudication.

## ORDER

O' BRIEN, *C.J.*, And now, October 15, 1982, the recommendation of the Disciplinary Board dated March 31, 1982, is accepted and the petition for reinstatement is granted.

The expenses incurred by the board in the investigation and processing of the petition for reinstatement shall be paid by petitioner.

Mr. Justice Nix and Mr. Justice McDermott would deny the petition for reinstatement.