IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2019 Term

_____

No. 18-0430

_____

FILED

**June 11, 2019**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE: PETITION FOR REINSTATEMENT OF THOMAS JASON DRAKE

_____

Lawyer Disciplinary Proceeding

REINSTATEMENT DENIED

_____

Submitted: May 15, 2019
Filed: June 11, 2019

Thomas Jason Drake
*Pro Se*
Elkview, West Virginia
Petitioner

Renee N. Frymyer, Esq.
Office of Disciplinary Counsel
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about publics reprimands, suspension or annulments of attorneys' licenses to practice law."  Syllabus Point 3, *Committee on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

2.      "A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to the questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment.  On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record."  Syllabus Point 3, *Committee on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

3.      "The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possess the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabilitation.  In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration

of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." Syllabus Point 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

4. "Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will engage in unprofessional conduct." Syllabus Point 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

WALKER, Chief Justice:

Thomas J. Drake's license to practice law in West Virginia was voluntarily annulled in 2012 after he entered an *Alford/Kennedy* plea[1] to felony embezzlement on charges related to his conduct while serving as trustee of a settlement fund. Specifically, Mr. Drake unlawfully withdrew $104,853.53 from the settlement fund, $70,798.67 of which he converted to his law firm's banking account. After the circuit court initially entered a restitution order requiring Mr. Drake to pay $56,906.39 to the trust's subrogee, Great American, Mr. Drake later filed bankruptcy and reached a settlement with Great American for about one-half that amount ($27,500). But, in the nearly two years since settling with Great American, Mr. Drake has failed to make any restitution payments. Now, Mr. Drake petitions this Court for reinstatement of his license. In light of the serious nature of the underlying offense, along with the lack of restitution payments, the Hearing Panel Subcommittee (HPS) and the Office of Disciplinary Counsel (ODC) recommend that we deny Mr. Drake's petition for reinstatement. We agree.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In April of 2007, the circuit court appointed Mr. Drake and Rhonda Miller as co-trustees of the trust established in *Timothy Urbanic, et al. v. Appalachian Timber*

---

[1] An *Alford/Kennedy* plea refers to an accused's ability to "voluntarily, knowingly and understandingly consent to the imposition of a prison sentence even though he is unwilling to admit participation in the crime, if he intelligently concludes that his interests require a guilty plea and the record supports the conclusion that a jury could convict him." (Syl. Pt. 1, in part, *Kennedy v. Frazier*, 178 W. Va. 10, 357 S.E.2d 43 (1987).

*Services, Inc.*[2] The trust was established to fund medical monitoring for class members and, if necessary, attic inspection and clean-up. The trust also funds inspections of a creosote plant to ensure compliance with environmental standards.

At the time of Mr. Drake's appointment, the circuit court entered an order requiring that any disbursements and expenditures from the trust be made only after the court's approval. From May 2008 until January 2009, Mr. Drake and Ms. Miller followed the proper protocol by submitting itemized fees and expenses and waiting for court approval. Even after Ms. Miller relocated and the circuit court made Mr. Drake the sole trustee, Mr. Drake continued to submit fees and expenses properly for the next five months. From May 2009 until August 2011, however, Mr. Drake wrote checks to his law office from the trust fund's account without seeking court approval for any of the payments.

Mr. Drake alleges that, in 2011, the Elk River Water Trail Project approached him seeking $28,000 from the trust. Mr. Drake claims that he converted the full sum from the trust to his IOLTA account fully expecting the circuit court to approve the transfer. Because the circuit court only approved $7,000, Mr. Drake claims that he returned the remaining $21,000 to the trust.

---

[2] Braxton County Civil Action No. 03-C-58

When he learned that Mr. Drake had withdrawn substantial amounts from the trust without court approval, the appointing circuit court judge removed him as trustee and notified the ODC who referred the matter to the West Virginia State Police. The State Police determined that Mr. Drake, while acting as sole trustee, withdrew approximately $104,853.43 from the trust and converted approximately $70,798.67 of those funds to his personal use. The State Police also determined that Mr. Drake created false ledgers for the trust to conceal, alter, and omit banking entries in order to skirt the court's oversight.

In September of 2012, Mr. Drake entered an *Alford/Kennedy* plea by way of information to one felony count of embezzlement and was sentenced to two years of supervised probation. The following month, his law license was annulled with his consent. Upon the successful completion of his probationary period in May of 2014, Mr. Drake was ordered to make restitution to Great American, the subrogee of the trust, in the amount of $56,906.39—to be paid in monthly installments of $2,371.10. Mr. Drake claims that there is no accounting or itemization showing how the court arrived at this figure.

Mr. Drake filed bankruptcy in December of 2014 claiming $390,900.04 in liabilities, including the amount owed to Great American. Notably, Mr. Drake failed to make any payments to Great American during the seven-month period between the restitution order being entered and the automatic stay being triggered by the bankruptcy

3

proceedings. Great American sued Mr. Drake and Ms. Miller,[3] but the suit against him was stayed pending the resolution of the bankruptcy. During the bankruptcy proceeding, Great American settled its claim with Mr. Drake in July of 2017 for $27,500 and agreed that it would be paid in monthly installments after the bankruptcy court entered a dismissal order. Although the circuit court entered an agreed order to the new amount, relieving Mr. Drake of any obligation under the June 2014 restitution order, the bankruptcy court has not yet entered a dismissal order. Mr. Drake argues that the bankruptcy court's failure to enter the order is sufficient to excuse his failure to make restitution payments.

Then, in May 2018, after satisfying the five-year waiting period and pursuant to Rules 3.30[4] and 3.33(b)[5] of the West Virginia Rules of Lawyer Disciplinary Procedure,

---

[3] Great American and Ms. Miller reached an early settlement agreement.

[4] Rule 3.30 provides:

> When for any reason, other than for nonpayment of membership fees, the license of any person to practice law has been or shall be suspended or annulled, whether or not for a limited time or until requirements as to restitution, conditions, or some other act shall be satisfied, such person shall not become entitled to engage in the practice of law in this State, whether such time has elapsed or such other requirements as to restitution, conditions, or some other act have been satisfied, until such person shall have been restored to good standing as a member of the West Virginia State Bar as provided herein. Any conviction for false swearing, perjury or any felony, and the person's prior and subsequent conduct, shall be considered in the determination of good moral character and fitness.

[5] Rule 3.33(b) provides, in relevant part:

Mr. Drake filed this petition for reinstatement of his law license. The ODC investigated and the HPS held a hearing to address the matter on September 27, 2018, during which numerous witnesses and Mr. Drake appeared to testify.

The HPS concluded that Mr. Drake's reinstatement would have a justifiable and substantial adverse effect on the public confidence in the administration of justice and is, therefore, not appropriate. The HPS was troubled by the nature of Mr. Drake's underlying criminal conduct, his current financial obligations, and his failure to pay restitution. The HPS found that Mr. Drake had not shown, by clear and convincing evidence the likelihood that, if reinstated, he would not engage in unprofessional conduct again. The ODC consented to the HPS's recommendation to deny reinstatement. In February of 2019, Mr. Drake filed his request for a hearing before the Court pursuant to Rule 3.33(c)[6] of the West Virginia Rules of Lawyer Disciplinary Procedure.

---

> After the expiration of five years from the date of disbarment, a person whose license to practice law has been or shall be annulled in this State and who shall desire reinstatement of such license may file a verified petition in the Supreme Court of Appeals reciting the cause of such annulment and what the person shall have done in satisfaction of requirements as to rehabilitation, restitution, conditions or other acts incident thereto, by reason of which the person should be reinstated as a member of the state bar and his or her license to practice law restored.

[6] Rule 3.33(c) provides:

> The Hearing Panel Subcommittee shall schedule a hearing within sixty days of its receipt of the report of

## II.  STANDARD OF REVIEW

We have long held that "[t]his Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspension or annulments of attorneys' licenses to practice law."[7] While we give respectful consideration to the recommendations of the HPS, this Court ultimately exercises its own independent judgment regarding reinstatement:

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to the questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.[8]

Disciplinary Counsel, or upon a later date upon a showing of good cause by the petitioner or Disciplinary Counsel. Following the hearing, the Hearing Panel Subcommittee shall promptly prepare a written report, including a recommendation with reference to action on the petition, and shall transmit the report to the Court. The report shall become part of the record in the case. The Hearing Panel Subcommittee shall mail, by registered or certified mail, a copy of the report to the petitioner at his or her last known address. Within ten days after the filing of the report of the Hearing Panel Subcommittee, either the petitioner or Disciplinary Counsel shall have the right to make written request of the Court for a hearing upon the matters arising on the petition.

[7] Syl. Pt. 3, *Comm. on Legal Ethics v. Blair*, 174 W. Va. 494, 327 S.E.2d 671 (1984).

[8] Syl. Pt. 3, *Comm. on Legal Ethics v. McCorkle*, 192 W. Va. 286, 452 S.E.2d 377 (1994).

As the parties do not dispute the HPS's findings of fact, we proceed to review de novo the HPS's recommendation regarding reinstatement.

## III.    DISCUSSION

In reinstatement proceedings, the party seeking reinstatement has a heavy burden of showing that he should be permitted to practice law again. We have held that

> [t]he general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment, he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration.[9]

Further, "in assessing an application for reinstatement[,] consideration must be given to the nature of the original offense for which the applicant was disbarred. Obviously, the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement."[10] We have stated that "the seriousness of the underlying offense

---

[9] Syl. Pt. 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

[10] *Id.* at 234, 273 S.E.2d at 571.

7

leading to disbarment may, as a threshold matter, preclude reinstatement such that further inquiry as to rehabilitation is not warranted."[11]

We first consider this threshold question of whether Mr. Drake's felony offense of embezzlement of client funds altogether precludes his reinstatement to the practice of law. Referring to the underlying crime as one of moral turpitude[12] reflecting adversely on his honesty, trustworthiness, and fitness to practice law, the HPS concluded and the ODC now argues that Mr. Drake's felony conviction should altogether preclude him from practicing law.

We first reiterate that we have never held that a convicted felon is altogether barred from the reinstatement of his license to practice law.[13] Instead, we analyze a petitioner's current attributes (integrity, moral character, and legal competence), the record of rehabilitation, and the impact that reinstatement would have on our profession as mandated in Syllabus Point 1 of *In re Brown*.[14] Although the seriousness of Mr. Drake's

---

[11] *Id.* at 240, 273 S.E.2d at 574 (citing *In re Smith*, 214 W. Va. 83, 585 S.E.2d 602 (1980)).

[12] We have previously defined "moral turpitude" as "any conduct that is contrary to justice, honesty and good morals." *Comm. on Legal Ethics v. Six*, 181 W. Va. 52, 54, 380 S.E.2d 219, 221 (1989) (quoting *In re Smith*, 158 W. Va. 13, 17, 206 S.E.2d 920, 923 (1974).

[13] *In re Reinstatement of diTrapano*, 240 W. Va. 612, 617, 814 S.E.2d 275, 280 (2018) (*diTrapano II*).

[14] 166 W. Va. 226, 273 S.E.2d 567.

underlying offense serves as the backdrop to our consideration of whether or not his license should be reinstated, we again decline to adopt the position that a convicted felon may never be reinstated to practice law in West Virginia. We underscore, however, that "the more serious the nature of the underlying offense, the more difficult the task becomes to show a basis for reinstatement."[15] And, we have previously stated that "[m]isappropation of funds by an attorney involves moral turpitude; it is an act infected with deceit and dishonesty."[16] For that reason, Mr. Drake must clear a high burden to overcome the implications of his felony conviction for embezzlement and the major violation of his duty as an officer of the Court.

We now turn to the question of whether Mr. Drake has overcome the adverse effect of his admitted and serious misconduct by demonstrating a record of rehabilitation. This Court has held that "[r]ehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that[,] after such rehabilitation is completed and the applicant is readmitted to the practice of law[,] he will engage in unprofessional conduct."[17] We have implemented a five-factor test in evaluating rehabilitation, stating that it is necessary to consider:

> (1) the nature of the of the original offense for which the petitioner was disbarred; (2) the petitioner's character,

---

[15] *Id.* at 234, 273 S.E.2d at 571.

[16] *Comm. on Legal Ethics v. Hess*, 186 W. Va. 514, 517, 413 S.E.2d 169, 172 (1991).

[17] Syl. Pt. 2, *Brown*, 166 W. Va. 226, 273 S.E.2d 567.

9

maturity, and experience at the time of disbarment; (3) the petitioner's occupations and conduct in the time since his disbarment; (4) the time elapsed since the disbarment; and (5) the petitioner's present competence in legal skills.[18]

Having already discussed the severity of Mr. Drake's actions, we move to the second factor—his character, maturity, and experience at the time of his voluntary annulment in 2012. Mr. Drake had practiced law for over a decade at the time he committed the acts that led to the annulment of his law license, operating his own firm for a portion of that time. Mr. Drake asks us to take into consideration that he had little experience in operating his own law firm and no experience whatsoever in trust management. We are not persuaded by Mr. Drake's attempt to couch felony embezzlement as a rookie mistake. Mr. Drake's actions with regard to the trust did not stem from lack of experience and his crimes were not the innocent missteps of a novice solo practitioner. Rather, Mr. Drake admittedly moved money from the trust into his personal IOLTA account in direct defiance of the circuit court's direction to first obtain its approval. Because Mr. Drake successfully managed the trust during the first several years he served as trustee, we can only assume that he possessed the requisite knowledge to do so.

We turn now to the third and fourth factors and consider Mr. Drake's occupation and conduct in the period following disbarment, as well as the amount of time that has passed. Mr. Drake had difficulty finding work after the annulment of his law

---

[18] *Smith*, 214 W. Va. at 85, 585 S.E.2d at 604.

license, and we recognize that hardship. Nonetheless, he secured employment with various companies, earning the title of Chief Operating Officer and then Estimator and Project Manager. Three years after his disbarment, he returned to the legal field in a paralegal capacity under the supervision and direction of Travis A. Griffith, Esq. (Mr. Griffith). From December of 2017 through March of 2018, however, Mr. Drake was unable to work due to an illness. He has since returned to his job as a paralegal. Likewise, we commend Mr. Drake for his volunteer work and flood relief efforts following the devastating floods in the Elk River communities in 2016.

In further support of his improved conduct since his 2012 disbarment, Mr. Drake notes that he sought treatment from a psychiatrist and was diagnosed with certain mental illnesses. But Mr. Drake has failed to produce any correlation between the actions leading up to his disbarment and these medical conditions. So, while we commend Mr. Drake for seeking help, without a direct correlation, we are unable to say to a sufficient degree that his psychiatric treatment will prevent further misconduct upon reinstatement.

Turning to the fourth factor, we agree with Mr. Drake that seven years is a long time. But just as important as what he has done in that period is what he hasn't done. In the seven years since his disbarment, Mr. Drake has failed to pay any restitution. We don't doubt that he is genuinely remorseful for his conduct, but he is obviously not remorseful to the point of repaying his debt. We are also concerned that Mr. Drake has had two civil worthless check complaints lodged against him during this period.

While we recognize that Mr. Drake pleaded to the crime of embezzlement, we are concerned by his continued attempts to qualify the money taken from the trust with excuses ranging from an alleged lack of experience to downplaying the amount owed in forensic accounting and legal fees to ascertain how much was taken from the trust. We need not rehash these attempted justifications because even if true, they do not change the fact that Mr. Drake intentionally made unauthorized withdrawals from the trust and has failed to make restitution for costs stemming from his dishonest and deceitful actions.

We are also troubled by Mr. Drake's reliance on the bankruptcy court's failure to enter a dismissal order to excuse his failure to make restitution payments. Because the order is required by the terms of the agreement with Great American to trigger repayment, Mr. Drake argues that its absence excuses him from his failure to make restitution for purposes of these proceedings. In support of his position, Mr. Drake has submitted an email he recently sent to an attorney for Great American:

> I am again writing to you regarding the Dismissal Order in the above-styled matter. I once again left a voicemail for you, as well. I had inquired about this issue in November, 2017 and you indicated that you had no information on the Dismissal Order. Approximately two weeks later, I suffered a sudden-onset illness that had me in ICU for over 3 weeks and hospitalized for over two months. Following that, I underwent a substantial amount of therapy and missed a great deal of work. *To be honest, I was focused on my recovery and did not think of the Dismissal Order.*
>
> *Now, I am attempting to get my law license reinstated and I have oral argument on May 15. I am going to have to inform the Court that not only have I not made restitution payments, but that I have never received the Order and,*

12

*frankly, don't even have any clue where to send the payments.* Could you please provide me with some information on the issue?[19]

It is evident from this communication that Mr. Drake did not prioritize restitution and did not exercise reasonable and diligent efforts to fulfill these obligations until he came before this Court seeking reinstatement of his law license.

As to the fifth factor regarding Mr. Drake's legal competence, we agree with Mr. Drake that his work as a paralegal for over three years and his completion of the requisite Continuing Legal Education weigh in his favor.  Likewise, to the limited extent we are permitted by our precedent,[20] we have taken into consideration the favorable testimony of Mr. Nicholas Casey, Esq. and Mr. Drake's employer, Mr. Griffith, as to the quality of his work.  We are similarly impressed with the testimony of Mr. Timothy Meyer regarding Mr. Drake's community service and involvement and Ms. Carolyn Long regarding Mr. Drake's character and work ethic.  We are deeply concerned, however, that none of those who testified had a full understanding of the underlying offense.

Our final consideration then is whether Mr. Drake's reinstatement would have a "justifiable and substantial adverse effect on the public confidence in the

---

[19] (Emphasis added).

[20] *Lawyer Disciplinary Bd. v. Vieweg*, 194 W. Va. 554, 559, 461 S.E.2d 60, 65 (1995) ("General statements and letters from attorneys, friends, and community leaders on behalf of a petitioner in a reinstatement proceeding are of little evidentiary value.")

administration of justice."[21]  We find that it would.  Mr. Drake's reliance on this Court's

decision in *diTrapano II*[22] is misplaced.  As we concluded in *diTrapano II*, the relevant

critical differences between Mr. diTrapano's second petition for reinstatement and his first

were that he "completed his federal sentence of five years supervised release, fully

accepted responsibility for his actions, and made full restitution."[23]   Unlike Mr.

diTrapano—and for the reasons set forth above—we are not convinced that Mr. Drake has

fully accepted responsibility for his actions.

For these reasons, we deny Mr. Drake's petition for reinstatement of his law

license.  Mr. Drake has failed to carry his heavy burden of proving to this Court that he

currently possesses the integrity and moral character necessary to resume the practice of

law.  We conclude that reinstatement would have a justifiable and substantial adverse effect

on the public's confidence in the administration of justice.  Although we decline to reinstate

Mr. Drake's law license at this time, we are hopeful that Mr. Drake will take the necessary

steps to better position himself for reinstatement in the future.

---

[21] Syl. Pt. 1, in part, *Brown*, 166 W. Va. at 226, 273 S.E.2d at 567.

[22] 240 W. Va. at 612, 814 S.E.2d at 275.

[23] *Id.* at 619, 814 S.E.2d at 282.

14

## IV.    CONCLUSION

We adopt the HPS's recommendation and decline to reinstate Mr. Drake's law license at this time.

Petition denied.