IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

**FILED**

**May 22, 2025**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 23-71

IN RE:  PETITION FOR REINSTATEMENT OF C. MICHAEL SPARKS

Lawyer Disciplinary Proceeding

REINSTATEMENT DENIED

Submitted:  April 23, 2025
Filed:  May 22, 2025

Lonnie C. Simmons, Esq.
DiPiero Simmons McGinley & Bastress,
PLLC
Charleston, West Virginia
Counsel for Petitioner
and
C. Michael Sparks
Williamson, West Virginia
Petitioner

Rachael L. Fletcher Cipoletti, Esq.
Chief Lawyer Disciplinary Counsel
Lauren Hall Knight, Esq.
Lawyer Disciplinary Counsel
Office of Lawyer Disciplinary Counsel
Charleston, West Virginia
Counsel for Lawyer Disciplinary Board

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.
JUSTICE BUNN, deeming herself disqualified, did not participate in the decision of this case.
JUDGE JACOB REGER sitting by temporary assignment.
JUSTICE TRUMP and JUSTICE WALKER dissent and reserve the right to file dissenting opinions.

SYLLABUS BY THE COURT

1.     "A *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Hearing Panel Subcommittee's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994).

2.     "Absent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the [Hearing Panel Subcommittee] in regard to reinstatement of an attorney are to be given substantial consideration." Syl. Pt. 3, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

3.     "The general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation. In addition, the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration

i

of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." Syl. Pt. 1, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

4.    "Ethical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989).

5.    "Rehabilitation is demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." Syl. Pt. 2, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980).

WOOTON, Chief Justice:

This matter arises from the recommendation of the Hearing Panel Subcommittee ("HPS") that petitioner C. Michael Sparks ("petitioner") be reinstated to the practice of law with a two-year period of supervision, following his disbarment by consent in October 2013. Petitioner's consent to disbarment was an express term of his agreement to plead guilty to a federal misdemeanor arising from an investigation into political and judicial corruption in Mingo County, West Virginia. Despite opposing his reinstatement before the HPS due to inconsistencies regarding his role in the crime, the Office of Disciplinary Counsel ("ODC") now consents to the HPS's recommendation of reinstatement.

This Court has before it all matters of record, including the exhibits and a transcript of the evidentiary hearing conducted by the HPS, as well as the briefs and arguments of petitioner and ODC. Upon our independent review, we conclude that petitioner has failed to meet his requisite burden to warrant reinstatement at this time and therefore reject the HPS's recommendation and deny the petition for reinstatement.

## I. FACTS AND PROCEDURAL HISTORY

Petitioner, who was admitted to the West Virginia State Bar in 1996, was originally elected Mingo County Prosecuting Attorney in 2004. He was thereafter twice reelected and resigned in 2013 as part of a federal plea deal for his role in a political and judicial corruption scandal in Mingo County involving former Judge Michael Thornsbury

1

("Thornsbury"). Petitioner pled guilty to violating 18 U.S.C. § 242 (1996), aiding and abetting deprivation of a constitutional right under color of law, a misdemeanor, for his role in a scheme to entice a criminal defendant to discharge his counsel, who was believed to be providing the press and/or FBI with information damaging to the then-Mingo County Sheriff. As part of his plea agreement, petitioner was required to surrender his law license, which was annulled by consent on October 11, 2013, pursuant to Rule 3.25 of the West Virginia Rules of Lawyer Disciplinary Procedure. This is his first petition for reinstatement.

By way of background, when running for prosecutor petitioner affiliated himself with a slate of political candidates headed by Thornsbury and referred to as "Team Mingo." Eugene Crum, former magistrate and Mingo County Sheriff ("Sheriff Crum"), who was murdered in early 2013, and County Commissioner David Baisden ("Baisden") were also part of this slate. Those who affiliated themselves with a slate of candidates led by former Senator Truman Chafin were perceived by Team Mingo to be political adversaries and included Attorney Charles "Butch" West ("West"), who ran against petitioner in his final bid for prosecutor.

In 2013, a federal investigation into political and judicial corruption in Mingo County was launched. Following the April 2013 murder of Sheriff Crum, petitioner began cooperating with the FBI in May and viewed himself as a "collaborator" in the federal investigation. The scandal was publicly brought to light through an August 2013,

indictment against Thornsbury alleging crimes of corruption stemming from his vendetta against the husband of his assistant, with whom he was allegedly having an extramarital affair (the "Thornsbury indictment"). Although he was not charged in the Thornsbury indictment, petitioner was specifically named and implicated in certain of its allegations.

Petitioner was instead charged in an October, 2013, information and pled guilty to a crime involving George White ("White"), discussed *infra*. Thornsbury was also charged separately by information in this incident and likewise pled guilty, resulting in the dismissal of the initial indictment against him.[1]

*THE WHITE ALLEGATIONS*

According to the federal information filed against petitioner, after the 2013 election, newly elected Sheriff Crum owed approximately $3,000 to White for political signs. When White began requesting payment, Sheriff Crum allegedly sent a confidential informant to conduct a controlled drug buy from White, resulting in the filing of five criminal charges against White in February 2013. In March 2013, Sheriff Crum approached petitioner, concerned that White had retained West as counsel, and advised that both White and West were speaking to the press and possibly the FBI, claiming that Sheriff

---

[1] For his role in this incident, Thornsbury was charged with violation of 18 U.S.C. § 241 (1996)—felony conspiracy against rights—and sentenced to fifty months' imprisonment.

Crum also purchased drugs from White. The information against Thornsbury alleges that petitioner was a "close associate and political ally" of Sheriff Crum's.

According to the information, Baisden—who was a good friend of White's brother—later approached petitioner and advised that "they" would "seek to coerce [White] into firing [West] in order to prevent [them] from further providing information about criminal conduct by the Sheriff." The information alleges that White was enticed to fire West with an offer of a "more favorable plea agreement" in which petitioner agreed to allow White to plead guilty to two of the five charges, surrender a lesser monetary forfeiture, and petitioner would recommend concurrent, rather than consecutive, sentences and/or probation. The information states that petitioner "entered into a plea agreement more favorable that [sic] he otherwise would have[] . . . knowing that a more favorable plea agreement for [White] was a necessary part of the scheme to coerce [White] into firing [West] in order to protect the Sheriff." As indicated, petitioner was charged in the information with the misdemeanor offense of deprivation of a constitutional right, i.e. White's right to counsel of his choice, under color of law.

Petitioner agreed to plead guilty to this charge and the plea agreement required petitioner to "voluntarily surrender his license to practice law in every state in which he holds such a license[,]" withdraw his opposition to the immediate suspension of his license, and refrain from contesting disbarment proceedings. The plea agreement executed by petitioner expressed his agreement to certain predicate facts as contained in an

attached "Stipulation of Facts" ("stipulation")—also executed by petitioner—and was relied upon at both petitioner's plea and sentencing hearings. The stipulation reiterates the pertinent portions of the information quoted above and further provides that petitioner "knowingly associated himself with the scheme to deprive [White] of his right to counsel of his choice, participated in that scheme, and did so with the intention to assist Baisden, the Sheriff, and others in depriving [White] of his right to counsel of his choice."

At the sentencing hearing, United States District Court Judge Thomas Johnston allowed Assistant United States Attorney Steven R. Ruby ("AUSA Ruby") to make a proffer consistent with the above, but inquired further to obtain clarification about whether petitioner knew of the scheme to coerce White *before* he made the more favorable plea offer. After consultation with petitioner's lawyer, AUSA Ruby represented to the district court that petitioner "was advised of and [assented] to the plan to deprive [White] of counsel before the proposal was made to [White.]" The court then specifically inquired whether "before the proposal was made to [White], [petitioner] had a conversation with [Baisden] in which he assented to the arrangement[] . . . . with the understanding that the arrangement would include . . . a more favorable plea agreement[?]" AUSA Ruby replied: "That's correct, Your Honor[]"; petitioner's counsel likewise agreed and quickly confirmed that petitioner "granted a better plea agreement[.]"

Critically, after this exchange, the district court addressed petitioner—who had been placed under oath at the outset of the proceedings—stating:

5

> THE COURT: . . . You've heard the representations made, factual representations[] . . . . Do you agree that those representations are true?
>
> THE DEFENDANT: Yes.[2]

(footnote added).

However, petitioner's counsel also remarked during this exchange that petitioner merely "omitted from trying to stop [the change of attorneys]"; in petitioner's statement before sentencing, he similarly characterized his role as a "failure to intervene when others convinced [White] to change lawyers" and that he "neglect[ed] [his] duty to stop it[.]" As a result, just before announcing petitioner's sentence, the district court stated:

> [I]n your remarks, and . . . at least in one written submission, it was asserted that your part in this was to stand by and not do something about it, but that's *inconsistent with the proffer that was made today* and I don't for a minute believe that you were—simply took a passive role in not doing something to stop this and I—I'm giving you the benefit of the doubt on that by not placing at issue your acceptance of responsibility for making a statement like that.

(Emphasis added). The court then sentenced petitioner to twelve months in prison, followed by twelve months supervised release; the court remarked that it believed the sentence—although the maximum allowable under the crime charged—was the bare

---

[2] The district court later again addressed the clarification of the "temporal issue" regarding petitioner's "assent in advance of the—or agreement in advance of the proposal." The court inquired "to the extent that I rely on that fact with regard to my factual basis . . . is there any objection[?]" After counsel indicated he had no objection, the court then posed that same question to petitioner, asking if he "underst[ood] that question" or had any objection; petitioner replied, "No. No, Your Honor."

minimum petitioner should receive for his "crime against our system of justice itself and a serious affront to the United States Constitution."

*THE PETITION FOR REINSTATEMENT*

Ten years later, in 2023, petitioner filed the instant petition for reinstatement.[3]  In both his sworn statement and subsequent testimony before the HPS, petitioner took a similar position regarding his role in the crime as that which concerned the district court:  that he simply failed to intervene in the scheme to deprive White of his counsel.  Petitioner further took the newly-established position that he offered White no better plea deal than he would have any other defendant—in stark contrast to the factual predicate upon which the district court accepted his guilty plea.  Petitioner characterized his conduct as a "failure to act more proactively and to protect [White's] right to counsel of choice[]" and that he utilized his customary graduated plea negotiation strategy.

With regard to his role in facilitating the scheme that was specifically probed by the district court, petitioner testified that any knowledge of the scheme was largely intuition.  Petitioner testified that when he was advised White was changing counsel, "I should have done something, because, you know, I was aware that—that the judge—" and "I knew—at least had reason to believe that there was great bigger—there was other things at play here."  When petitioner was asked why Baisden would want West off the case,

---

[3] West Virginia Rule of Lawyer Disciplinary Procedure 3.33 governing reinstatement following annulment prohibits a petition for reinstatement until five years after disbarment.

7

petitioner replied: "[I]t had that stench to it that, you know, 'Here we go.' . . . . I should have said, you know, 'Hey, guys, this is—you know, *I know what's going on here.* This is no good.'" (Emphasis added). Petitioner admitted that "from talking to [Baisden] . . . [petitioner] knew that part of this thing that was going on, they were . . . going to make sure [White] got a different lawyer[.]"

Regarding the plea offer made to White, petitioner testified extensively that he offered White plea terms consistent with his customary practice of reducing more than three charges to two, typically reserving a counteroffer to run sentences concurrently as plea negotiations continued. According to petitioner, he offered to drop three of the five counts while West still represented White. Baisden thereafter approached him and asked if he could "do better" than the offer on the table; later, Baisden approached him again and stated "'we're getting rid of—[White] is going to get a new attorney.'" However, petitioner emphasizes that he had already made an initial offer to reduce the charges to West, who then withdrew as counsel without "[coming] back to me[.]" After White obtained new counsel, petitioner then negotiated the charges as running concurrently with White's substitute counsel, a friend of Thornsbury's. Petitioner further testified that he later became aware that Thornsbury had advised Baisden that White would not get probation with West as his attorney and that at White's sentencing, he recommended probation. Petitioner excused his "failure to act" to prevent the coercion to change counsel by reasoning, "'He's going to get the same deal he's going to get anyway,' you know, so I did nothing about it."

To that end, petitioner testified that the underlying events "may have not 100 percent happened the way the stipulation of facts [indicated]," outright denying that he was a "conspirator" with Thornsbury and Baisden or that he "knowingly . . . [did] this as part of an agreement with them[.]" While denying that the plea agreement was "negotiated at [Baisden's] behest or direction[]" petitioner nevertheless conceded that Baisden "was involved in everything[.]" As to the specific correlation between the change of counsel and Sheriff Crum's concerns about West and White speaking to the press or authorities, petitioner admitted to no overt awareness, but testified that "recalling that conversation [with Sheriff Crum], that he was angry . . . there's . . . easily drawn inferences that I *should have made* and—and—and didn't." (Emphasis added).

Upon questioning by ODC before the HPS about why he agreed to and pled guilty based on the facts contained in the stipulation, petitioner testified that his attorney initially "accepted [the plea deal] without knowing what I was going to plead to" but that petitioner was unwilling to "roll the dice" against threats of stiffer charges by AUSA Ruby.[4] When directly confronted with the contradictions in his testimony, the predicate facts upon which the district court accepted his guilty plea, and the suggestion that the

---

[4] Petitioner also seemingly alluded to other potential crimes stating, "I thought there's one thing that I was comfortable pleading to[] [but] [t]hey didn't want that. They wanted something to do with Thornsbury[.]" With regard to his cooperation with the FBI in May, petitioner stated he "could have done it earlier than May, you know, because there's some other things that . . . had happened."

9

stipulation "may not accurately portray your involvement[,]" petitioner attempted to walk back his inconsistency:

> I would just say that whatever the—I accepted responsibility under the stipulation of facts. . . . These facts are required to . . . provide a factual basis for the conviction that I had. . . . *If I did not stipulate to these facts as written, then I would not have been able to—the judge would have rejected the plea. . . .* So I accept, you know, whatever facts that they—they wrote there. . . . [T]o the extent that my testimony here today is different from the stipulation of facts, then—then it's a mistake on my part, and I accept the stipulation of facts as written.

(Emphasis added).

This disparity between the stipulation—as a necessary factual basis for the district court's acceptance of his plea—and his current testimony prompted ODC to oppose petitioner's reinstatement, as per its proposed recommended findings to the HPS. In those proposed findings, ODC argued that based on the seriousness of the underlying conduct and because petitioner had not shown the requisite rehabilitation by virtue of his equivocation about his role, he should not be reinstated. ODC noted that petitioner had been practicing for seventeen years at the time of the misconduct and argued that his current repackaging of his role in the crime was a poor reflection on his character and integrity, deeming his equivocation "striking and troublesome."

As indicated above, however, after issuance of the HPS's recommended decision granting reinstatement, ODC filed its consent to reinstatement with this Court and

10

its brief now likens petitioner's case to those in which reinstatement has been granted. ODC has offered no explanation for its reversal of position on petitioner's reinstatement.

*THE HPS'S RECOMMENDATION*

In recommending reinstatement, the HPS accepted petitioner's proposed findings and conclusions justifying the "perceived" disparity between his stipulation and present testimony; in fact, its recommendation goes so far as to conclude that petitioner's "statements and testimony *have remained consistent*." (Emphasis added). Specifically, the HPS's findings deem it significant—for reasons that are not well articulated—that petitioner did not negotiate directly with Baisden, nor did the federal information claim that he did; rather, a "known messenger," who was not petitioner, conveyed the plea offer. The recommendation found that by simply negotiating with White's new counsel, petitioner engaged in conduct sufficient to provide a basis for his guilty plea. The HPS further focused on the fact that petitioner offering a "more favorable" plea deal was not necessary to establish the elements of the crime.

Further, the HPS heavily emphasized petitioner's early cooperation with the federal government, which was characterized as "substantial" and critical to its success in obtaining the convictions stemming from its investigation. The HPS noted that petitioner cooperated without demands for immunity and further emphasized his "*unwavering acceptance of responsibility*" as well as the absence of any benefit to him to participate in the crime. (Emphasis added). It found that his integrity and moral character was shown

11

through his assistance to the government and commented heavily on his demonstrated remorse.

Finally, in recommending reinstatement, the HPS emphasized petitioner's record of post-annulment conduct, which is relatively undisputed. Before he served his prison term, petitioner obtained employment working at a local movie theater and has worked as a paralegal at various Williamson law firms. Petitioner touted his work assisting a high-profile client in his defamation suit and his wide variety of civil work since working as a paralegal. His testimony indicates he is a dedicated family man, church-going, and active in his community. After publication of his reinstatement petition, ODC received no letters in opposition to his reinstatement. Both petitioner and his character witness claimed that if returned to the practice of law in his community, petitioner would be warmly welcomed as many in the community believe he was "done wrong."

*PETITIONER'S DISCIPLINARY RECORD*

At the time of his disbarment, petitioner had three prior admonishments: a March 1999 admonishment for violation of West Virginia Rule of Professional Conduct 1.9(b) (conflict of interest with former client), a May 2007 admonishment for violation of Rule 5.3 (failure to supervise nonlawyer), and a June 2009 admonishment for another violation of Rule 1.9(b) (conflict of interest with former client). Significantly, at the time of petitioner's consent to disbarment, he also had five open disciplinary complaints, all of which were closed as a result.

We note that two of the five complaints closed as a result of petitioner's consent to disbarment make similar allegations of politically-motivated corruption—chief among which is ODC's complaint against petitioner for misconduct as outlined in the Thornsbury indictment.[5]  As alleged in the August 2013 indictment, in 2008 Thornsbury began an extra-marital affair with his assistant, K.W.; by mid-2008 K.W. had terminated the relationship and Thornsbury began attempting to have K.W.'s husband, R.W., criminally prosecuted through various schemes.  Petitioner's participation in and/or knowledge of certain of these schemes was expressly referenced in the indictment and he offered testimony in that regard below.  His admissions indicate that he "should have" investigated and/or reported Thornsbury's conduct with regard to several incidents.[6]  In its

---

[5] In addition to ODC's complaint regarding petitioner's misconduct alleged in the Thornsbury indictment, a complaint filed by a member of the Mingo County bar alleges that petitioner—accompanied by "a county commissioner"—pressured her clients to waive their preliminary hearings outside of her presence.  The complainant also alleged that in a separate matter, Thornsbury and petitioner approached her about a recently convicted client, offering habeas grounds to assert because "they" believed he was innocent and guaranteeing his release.  Petitioner filed no response to this complaint before it was closed.

Of the remaining three complaints, one alleges a conflict of interest in petitioner's prosecution of a former co-worker of his wife; a civil suit filed in this regard was apparently dismissed as against petitioner on the grounds of prosecutorial immunity.  The two remaining complaints involve general allegations of dissatisfaction regarding petitioner's dismissal of a charge and disclosure of information in discovery.

[6] In particular, the Thornsbury indictment alleges that Thornsbury conspired to have R.W. prosecuted for stealing mine bits from his employer despite R.W. being expressly permitted to salvage the mine bits, which were of little value.  Petitioner disqualified himself from the matter on the basis that he interacted with K.W. on a daily basis through his duties as prosecutor, but when asked before the HPS whether he was "aware that the charges against R.W. were improper[]" petitioner replied that he "[p]robably" should have

13

petition for immediate suspension of petitioner, ODC alleged seven Rule violations for petitioner's misconduct in regard to White and five Rule violations for petitioner's involvement in and knowledge of the matters outlined in the Thornsbury indictment, citing it as part of petitioner's "pattern of egregious misconduct under the color of his position as the Prosecuting Attorney of Mingo County[.]"[7] The closure document of each open complaint states:

---

"looked into it[.]" The Thornsbury indictment specifically alleges that petitioner "recognized that the criminal charges against R. W. were improper[]"; ODC's closure of the complaint indicates that petitioner's response to the complaint conceded he was "suspicious of the charges, based on the rumors circulating regarding Thornsbury and K.W.'s relationship."

In a second scheme alleged in the Thornsbury indictment, Thornsbury assembled—of his own volition—a grand jury and appointed his friend and business partner as foreperson for purposes of investigating a "large theft ring" allegedly involving R.W. and his family members. The indictment alleges that Thornsbury personally prepared subpoenas duces tecum which were issued by the grand jury and petitioner testified that he fielded inquiries regarding procedural issues surrounding the subpoenas. Regarding this scheme, petitioner testified he "should have reported it[]" and that "it was completely wrong to have a grand jury without, you know, a prosecutor." The Thornsbury indictment specifically alleges that petitioner "declined to participate in" the grand jury scheme.

Finally, the Thornsbury indictment alleges that Thornsbury facilitated R.W.'s arrest for an altercation with family members at a convenience store; witnesses indicated that R. W. was not the aggressor and acted in self-defense as confirmed by surveillance video. Thornsbury allegedly had an ally approach petitioner to instruct that R. W. should receive six months in jail for the offense. Petitioner confirmed that he "believed at that time that Thornsbury actually [sent] him," that Thornsbury was "trying to get [him] to send a guy to jail for six months[,]" because "he was trying to get [K.W.'s] husband out of the way."

[7] ODC asserted that petitioner's conduct in regard to the White matter violated Rule 8.3(b) (requiring reporting professional misconduct); Rule 3.8 (regarding special responsibilities of prosecutor); Rule 8.4(a) (prohibiting violating or assisting another in violating Rules); Rule 8.4(b) (prohibiting criminal act reflecting on honesty/trustworthiness or fitness); Rule 8.4(c) (prohibiting conduct involving dishonesty/fraud/deceit/misrepresentation); Rule 8.4(d) (prohibiting conduct prejudicial to

On or about October 11, 2013, the Supreme Court of Appeals of West Virginia entered an order which annulled [petitioner's] license to practice law pursuant to his Consent to Disbarment. In light of the annulment of [petitioner's] license, this matter will be closed. *The Office of Disciplinary Counsel will establish a reinstatement file on [petitioner] and will place these records therein, so should [petitioner] seek reinstatement at any time in the future, the allegations contained within this complaint may be considered at that time.*

(Emphasis added). The closure document expressly allows petitioner to file a written objection to the closing within forty-five days; there is no indication petitioner filed any such objection.

## II. STANDARD OF REVIEW

Generally, "[a] *de novo* standard applies to a review of the adjudicatory record made before the [Hearing Panel Subcommittee] . . . . [and] substantial deference is given to the [Hearing Panel Subcommittee's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. McCorkle*, 192 W.Va. 286, 452 S.E.2d 377 (1994). With respect to reinstatement specifically, we have held that "[a]bsent a showing of some mistake of law or arbitrary assessment of the facts, recommendations made by the [HPS] in regard to reinstatement of an attorney are to be given substantial consideration." Syl. Pt. 3, *In re Brown*, 166 W. Va. 226, 273 S.E.2d 567 (1980). Nevertheless, we have

administration of justice) and 8.4(f) (prohibiting knowingly assisting judge in conduct that violates Rules of Judicial Conduct). ODC asserted that petitioner's conduct in regard to the allegations in the Thornsbury indictment violated Rules 8.3(b), 3.8, 8.4(c), 8.4(d), and 8.4(f).

further reminded that "[w]hile we give respectful consideration to the recommendations of the HPS, this Court ultimately exercises its own independent judgement regarding reinstatement[.]" *In re Reinstatement of DiTrapano*, 240 W. Va. 612, 616, 814 S.E.2d 275, 279 (2018) ("*DiTrapano II*").

## III. DISCUSSION

As is well-established from our jurisprudence regarding petitions for reinstatement following disbarment,

> [t]he general rule for reinstatement is that a disbarred attorney in order to regain admission to the practice of law bears the burden of showing that he presently possesses the integrity, moral character and legal competence to resume the practice of law. To overcome the adverse effect of the previous disbarment he must demonstrate a record of rehabilitation.

*In re Brown*, 166 W.Va. at 226, 273 S.E.2d at 567, syl. pt. 1, in part. Moreover, "the court must conclude that such reinstatement will not have a justifiable and substantial adverse effect on the public confidence in the administration of justice and in this regard the seriousness of the conduct leading to disbarment is an important consideration." *Id*. To aid in evaluation of the above considerations, the Court has frequently utilized a non-exclusive, five-factor analysis to ascertain whether reinstatement is appropriate:

> (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills.

16

*In re Smith*, 214 W. Va. 83, 85, 585 S.E.2d 602, 604 (1980).[8]

With regard to the nature of the original offense, the Court has observed that "there will be cases where the original transgression is so threatening to the integrity of the entire legal system that no brief period of even the most exemplary conduct can provide satisfactory assurance to the Court that the public will be adequately protected." *Id.* at 88, 585 S.E.2d at 607. We explained that in those instances, the gravity of the misconduct undermines any confidence the petitioner is "sufficiently rehabilitated that the public will be adequately protected" and that such instances commonly occur "where the underlying offense was directly related to the practice of law." *Id.* at 87, 585 S.E.2d at 606. In contrast, we have granted reinstatement following misconduct that was "reprehensible, but . . . completely unrelated to the petitioner's law practice or activities as an officer of the Court." *Id*. at 88, 585 S.E.2d at 607.

---

[8] Although we find other factors determinative, we note that as to factors two through five, there is little dispute. Petitioner had been practicing law for seventeen years—nine as prosecuting attorney—at the time of the underlying misconduct; therefore, he was by no means inexperienced. And while petitioner makes much of the fact that he intentionally waited twice the requisite amount of time provided in Rule 3.33 before petitioning for reinstatement, we have noted that "the mere passage of time alone is insufficient to warrant reinstatement." *In re Brown*, 166 W. Va. at 235, 273 S.E.2d at 572. That said, however, petitioner's post-annulment conduct is, by all accounts, exemplary: he has maintained gainful employment, conducted himself respectably, and ostensibly maintained legal competence to resume the practice of law through his work at various firms. We encourage his continued dedication to these efforts.

17

We therefore find it necessary to first evaluate the nature of petitioner's specific misconduct, particularly given his insistence that the factual predicate to which he agreed during his sentencing hearing "may have not 100 percent" reflected his involvement. Based upon the documents and proceedings before the district court, petitioner expressly agreed—*under oath*—that he was aware of and assented to the scheme to deprive White of counsel and that, to facilitate that scheme, granted a more favorable plea deal than he otherwise would have—all for the purpose of protecting the sheriff. For purposes of reinstatement however, petitioner maintains that he made White the same plea offer he would have otherwise and was only passively aware of an attempt to coerce White to change attorneys. He outright denies participating for purposes of protecting the sheriff.

As outlined in our above discussion of his guilty plea, there is no question that petitioner expressly agreed to being a necessary part of a scheme to coerce White to change attorneys and offered him more favorable plea terms than he otherwise would have, with full knowledge of the scheme and for the purpose of protecting the sheriff. These specific admissions of his knowledge and active participation are not assumptions or unchallenged issues buried within a cold record. The district court vigorously and specifically probed into the precise issue of petitioner's knowledge, role, and motivations before accepting his guilty plea and required petitioner to affirmatively agree to its characterization of those matters. Moreover, the district court took petitioner to task for merely insinuating the full-throated argument he now offers this Court, i.e., that he was a simple bystander to corruption. The court stated that this suggestion jeopardized its

18

consideration of petitioner's "acceptance of responsibility" for sentencing purposes and expressly found that this contention was "inconsistent with the [factual] proffer that was made" in support of his guilty plea. We agree.

Despite offering expected expressions of remorse and acceptance of responsibility, petitioner's reinstatement testimony is clearly designed to significantly downplay his involvement in the corruption in Mingo County. There is simply no question that petitioner's testimony for purposes of reinstatement differs in every *material* way from the facts to which he agreed for purposes of securing a simple misdemeanor conviction. If petitioner made admissions that were not true for purposes of leniency from the government or sentencing court, he bears the consequences of those admissions before this Court.

With the specifics of petitioner's adjudicated misconduct established, we consider its gravity. The Court has expressly held that "[e]thical violations by a lawyer holding a public office are viewed as more egregious because of the betrayal of the public trust attached to the office." Syl. Pt. 3, *Comm. on Legal Ethics of W. Va. State Bar v. Roark*, 181 W. Va. 260, 382 S.E.2d 313 (1989); *see also Off. of Law. Disciplinary Couns. v. Plants*, 233 W. Va. 477, 485, 759 S.E.2d 220, 228 (2014) (observing that prosecutor holds "position of public trust and must be held to a heightened standard of ethical behavior"). For that reason, we have found the seriousness of underlying misconduct virtually outcome determinative for reinstatement purposes where the lawyer is also a

19

public official whose misconduct intersects with or denigrates the legal system. *See, e.g., In re Brown,* 166 W. Va. at 239, 273 S.E.2d at 574 (denying reinstatement where underlying crimes were "directed . . . to the core of the legal system and the integrity of governmental institutions").

In contrast, we have distinguished misconduct that stems from personal challenges such as drug or alcohol addiction, even where the conduct gives rise to federal criminal charges. *See Roark*, 181 W. Va. at 260, 382 S.E.2d at 313 (three-year suspension following mayor/prosecutor's plea to drug-related federal misdemeanors); *Comm. on Legal Ethics of the W. Va. State Bar v. White*, 189 W. Va. 135, 428 S.E.2d 556 (1993) (two-year suspension following prosecutor's plea to drug-related federal misdemeanors); *DiTrapano II*, 240 W. Va. at 616-18, 814 S.E.2d at 279-81 (granting reinstatement after completion of "comprehensive and long-term" drug rehabilitation and acceptance of "full responsibility" for misconduct); *see also Law. Disciplinary Bd. v. Busch*, 233 W. Va. 43, 754 S.E.2d 729 (2014) (three-year suspension following prosecutor's discovery violations where personal problems and mental health disorder contributed).

In this case, petitioner was not merely a lawyer who also happened to hold public office, committing misconduct only tangentially related to his professional and public obligations. Petitioner's failures were not purely personal, nor was his conduct borne of negligence or indifference to professional duties—or even the type of intentional misconduct resulting in monetary or other prejudice to client interests. Instead, petitioner's

20

misconduct leveraged the power and trust placed in him by the electorate to affect the constitutional rights of a private citizen, all for the protection of fellow corrupt public officials. It was petitioner's position as an elected official and the county's chief law enforcement officer that provided him the opportunity and power to engage in his intentional misconduct—against the very citizens he swore to protect in that position.

With the certainty and gravity of petitioner's misconduct in little doubt, we find that the position he has taken in the instant proceedings reflects poorly on his current rehabilitation, fitness, and integrity. We have held that rehabilitation is "demonstrated by a course of conduct that enables the court to conclude there is little likelihood that after such rehabilitation is completed and the applicant is readmitted to the practice of law he will engage in unprofessional conduct." *In re Brown*, 166 W. Va. at 226-27, 273 S.E.2d at 567, syl. pt. 2, in part. Rehabilitation, by its nature, requires an attorney's acknowledgement of his wrongdoing and we have therefore tied the rehabilitation analysis to the generalized integrity and fitness requirements for reinstatement. *See In re Reinstatement of DiTrapano*, 233 W. Va. 754, 772, 760 S.E.2d 568, 586 (2014) ("*DiTrapano I*") (finding attorney's "unwillingness to accept responsibility for his actions[] . . . compels us to question his integrity and moral character, [and] weighs against finding that he is rehabilitated." (footnote omitted)).

Although ODC has silently retreated from its opposition to petitioner's reinstatement, it has previously opposed reinstatement where a lawyer's testimony is

21

inconsistent regarding the underlying misconduct, as reflecting a lack of sufficient rehabilitation. In *DiTrapano I,* the Court considered the petition for reinstatement of a lawyer disbarred after pleading guilty to federal charges relating to controlled substances and firearms. Subsequent to his disbarment, DiTrapano pled guilty to an information charging him with making false statements for purposes of influencing a bank. *Id*. at 759, 760 S.E.2d at 573. In considering reinstatement, the Court acknowledged that the record was replete with DiTrapano's expressions of remorse and acceptance of responsibility, wherein he called his conduct "categorically wrong[.]" *Id*. at 761, 760 S.E.2d at 575. Notwithstanding these statements, the Court emphasized that the record was equally filled with the caveat that there were "'explanations for some of this conduct,'" as well as DiTrapano's position that he "'lacked the requisite intent to commit any crime.'" *Id*.

In this regard, the Court focused on DiTrapano's conviction for knowingly making a false statement to the bank and his position that the loan at issue was paid in full, he "thought" he had authority to execute the loan documents, and the client was not ultimately harmed by his actions. *Id*. at 762, 760 S.E.2d at 576. The Court rejected these explanations as an "attempt[] to minimize his dishonest conduct" and noted specifically that "[t]he gravity of Mr. DiTrapano's misconduct cannot be minimized by the lack of harm[.]" *Id*. at 768, 760 S.E.2d at 582. In addition—and highly similar to petitioner's retreat from the predicate facts upon which he pled guilty—the *DiTrapano I* Court found that the

22

> inconsistencies between his statements to the HPS, the Questionnaire, and the [Stipulation] of Facts . . . lead us to question his appreciation of the wrongfulness of his misconduct and his ability to conform his behavior to the Rules of Professional Conduct at this time. *Because of these inconsistencies*, we do not believe that Mr. DiTrapano has demonstrated adequate rehabilitation with regard to his honesty and integrity.

*Id.* at 771, 760 S.E.2d at 585 (emphasis added).

Like petitioner, DiTrapano presented a record of commendable post-annulment conduct; in particular, DiTrapano demonstrated sobriety, gainful employment, and professions of acceptance of responsibility and remorse. However, the Court found that despite this record, the inconsistencies and attempts to minimize his misconduct undermined the superficial appearance of adequate rehabilitation: "More compelling are the falsehoods[] . . . . [that] indicate that Mr. DiTrapano's inclinations regarding the truth have not been amended to an extent that would overcome the nature of his prior dishonest conduct." *Id.* at 772, 760 S.E.2d at 586.

Similarly, we acknowledge petitioner's exemplary post-annulment conduct and commend him for these efforts. We further acknowledge petitioner's repeated concessions about the gravity of his actions, the impropriety of his conduct, and even his attempt to retreat from the lack of accountability his current testimony suggests. But rehabilitation sufficient to warrant reinstatement is not demonstrated *solely* by falling on one's sword and thereafter avoiding personal or professional missteps—that is the bare

23

minimum expected from a disbarred attorney before seeking reinstatement. Accountability must be more than superficial; it must be thorough and consistently reflected in a lawyer's words and actions. *See In re Reinstatement of Drake*, 242 W. Va. 65, 70, 829 S.E.2d 267, 272 (2019) (denying reinstatement where attorney "continued attempts to qualify [misconduct] . . . with excuses ranging from an alleged lack of experience to downplaying [the misconduct.]").

In this case, we cannot ignore petitioner's unjustifiable position that although he admitted, under oath, to facts for the purpose of avoiding more serious criminal exposure, he should now be permitted to minimize his "actual" involvement and be granted the favor of leniency as a result. And while we do not presume to wholly dismiss petitioner's stated regret, this posturing makes his acceptance of responsibility appear more expedient than sincere. As Justice Workman noted in *DiTrapano I*, denial of reinstatement is well justified where "statements in the proceedings below and . . . to this Court suggest that . . . acceptance of responsibility is disingenuous." 233 W. Va. at 773, 760 S.E.2d at 587 (Workman, J., concurring). Of a similar tenor, when asked why he consented to disbarment, petitioner testified that he did so because he had "pled guilty to a federal offense, and . . . I disgraced my profession, and just that's—I thought that's what I needed to do." Much to the contrary, petitioner's consent to disbarment was a specific term of the plea agreement into which he entered with the government, rather than a voluntary gesture of penitence.

24

To put a finer point on it, petitioner has now offered two contradictory accounts of his misconduct—both under oath. His current willingness to demean the oaths he took prior to each piece of testimony provides little reassurance that he now possesses the inviolate respect for the legal system which he previously lacked. *See Law. Disciplinary Bd. v. Moore*, 214 W. Va. 780, 793, 591 S.E.2d 338, 351 (2003) (discussing requirement to "address[] the attitudes and circumstances that led to . . . misconduct"). Moreover, petitioner's attempt to mitigate his conduct by characterizing it as a mere "failure to intervene" is cold comfort to the victims of Mingo County corruption. We are mindful of the message that would be sent not only to the citizens of Mingo County, but the State and bar at large, were this Court to so easily permit petitioner to recast his role in a period of Mingo County politics that remains a stain on the county and State. *See* Syl. Pt. 2, in part, *White*, 189 W. Va. at 136, 428 S.E.2d at 557 (requiring lawyer discipline to both "serve as an effective deterrent to other members of the Bar" and "restore public confidence in the ethical standards of the legal profession.").

We therefore reject the fundamental premise underlying the HPS's recommendation of reinstatement: that petitioner has demonstrated "unwavering" remorse and maintained consistency regarding his role in the underlying misconduct. The HPS's attempt to rationalize the blatant discrepancies in petitioner's testimony are neither reasonable, persuasive, nor warranted. Petitioner's self-serving attempt to distance himself from his own sworn admissions militates against a finding of sufficient rehabilitation; the rationale expressed by the HPS fails to persuade us otherwise.

25

In recommending reinstatement the HPS placed substantial emphasis on petitioner's cooperation with the federal investigation. However, petitioner himself admitted he viewed himself as a "collaborator" with the government at the outset of the investigation—well before he perceived himself to be a target—and therefore his cooperation cannot be viewed primarily as an act of contrition. Petitioner's subsequent cooperation was duly credited by the sentencing court, but given his broader implication in the Thornsbury indictment, this cooperation—like his guilty plea—could be reasonably construed as an attempt to limit criminal exposure rather than repentance.[9] *See White*, 189

---

[9] In this regard, despite ODC and the HPS's seeming indifference to them, we cannot ignore petitioner's admissions regarding the serious allegations against him as outlined in the Thornsbury indictment and commensurate disciplinary complaint. The Court has admonished that "we do not view the inquiry on reinstatement as limited to the single issue of the precise offense that triggered disbarment. Most courts have concluded that [an] applicant's prior and present record of infractions can be considered." *In re Brown*, 166 W. Va. at 239, 273 S.E.2d at 574; *DiTrapano I,* 233 W. Va. at 766, 760 S.E.2d at 580 (same); *In re Reinstatement of Wheaton,* 245 W. Va. 199, 210, 858 S.E.2d 662, 673 (2021) (Armstead, J., dissenting) (opposing reinstatement in part where "sixteen additional complaints were filed against Mr. Wheaton and not pursued because he was disbarred.").

ODC indicated during oral argument that, due to the passage of time and the lack of public opposition to petitioner's reinstatement, it did not reopen, investigate, or evaluate the five disciplinary complaints closed upon petitioner's consent to disbarment. Nevertheless, at least as pertains to the Thornsbury indictment allegations and accompanying disciplinary complaint, the record contains petitioner's response to that complaint and testimony before the HPS, as discussed *supra*. Petitioner's testimony unquestionably indicates that several of the Rule violations asserted by ODC in that regard would likely have been substantiated had he not consented to the closure of those matters as part of his disbarment, resulting in an enhanced disciplinary record against which his petition for reinstatement would have been evaluated.

And while petitioner may also theoretically have been exonerated as to some of those allegations, we caution lawyers who consent to disbarment regarding the potential impact of permitting closure of pending matters *without objection*. We decline to tacitly encourage lawyers to voluntarily consent to disbarment, allow the closure of open

W. Va. at 138, 428 S.E.2d at 559 ("While these actions are commendable, they can also be viewed as a prudent realization of the substantiality of the government's case."); *Law. Disciplinary Bd. v. Busch*, 233 W. Va. 43, 56 n.11, 754 S.E.2d 729, 742 n.11 (2014) (finding prosecutor's resignation "was not an act of remorse. Rather, we view it as an attempt to avoid reprimand and to keep his digressions out of the public spotlight.").

A lawyer who offers continued "rationalizations, extenuating circumstances, absence of thorough memory, or evasiveness" while seeking reinstatement only diminishes otherwise compelling evidence of rehabilitation. *DiTrapano I,* 233 W. Va. at 775, 760 S.E.2d at 589 (Workman, J., concurring). Accordingly, we find that in the course of this proceeding petitioner has failed to presently demonstrate the requisite rehabilitation, integrity, and fitness to be returned to the practice of law.

disciplinary matters without objection, only to seek reinstatement later with the unwarranted assumption of a clean slate. We likewise caution ODC to ensure that its investigation into and position on petitions for reinstatement adequately account for such complaints.

## IV. CONCLUSION

For the foregoing reasons, we deny the petition for reinstatement to the practice of law.

Petition Denied.